995 P.2d 1278 (2000)
100 Wash.App. 104
STATE of Washington, Respondent,
v.
Jacob Patrick BROWN, Appellant.
State of Washington, Respondent,
v.
Marshall C. Harris, Appellant.
Nos. 41310-4-I, 41524-7-I.
Court of Appeals of Washington, Division 1.
March 27, 2000.
*1279 Nielsen Broman & Associates PLLC, David B. Koch, Catherine Lynn Floit, Seattle, for Appellant Jacob Patrick Brown.
Gregory Charles Link, Washington Appellate Project, Seattle, for Appellant Marshall C. Harris.
Charles Wesley Lind, Seattle, for Respondent.
BAKER, J.
Jacob Brown was convicted of felony murder, two counts of first degree robbery, first degree rape, and three counts of first degree assault, based upon three separate incidents that occurred during a two-week period. Codefendant Marshall Harris was convicted of first degree rape, first degree robbery, and first degree assault as a result of his participation in one of those incidents. Brown and Harris appeal their convictions and sentences on numerous procedural and evidentiary grounds.
We affirm the imposition of consecutive sentences against Brown and Harris for the rape and assault of Lewis Brown because they constituted serious violent offenses arising from separate and distinct criminal conduct. We uphold the trial court's finding that the traffic stop and investigation of Brown was valid based on the officer's reasonable suspicion that Brown was the person described in the warrant. We affirm the conviction of Brown and Harris for first degree assault against Lewis Brown. We hold that the court properly denied Brown's witness immunity request as well as his motion to sever the felony murder count. The trial court properly declined to give a unanimity instruction for the rape, robbery and assault of Lewis Brown because the Petrich[1] requirements were satisfied. We uphold the trial court's finding that the rape, robbery and assault of Lewis Brown by Brown and Harris did not constitute "same criminal conduct." We find that the court properly denied Harris's motion to sever defendants. We hold that the trial court's accomplice liability instruction, if erroneous, was harmless error.
However, we hold that there was insufficient evidence to convict Jacob Brown of first degree assault against Jerel Tackett, and accordingly we reverse and dismiss that conviction. We further hold that the felony murder conviction violated Brown's right to a unanimous jury verdict, and we reverse and remand that conviction for a new trial. Lastly, we reverse and remand the firearms enhancements against Brown and Harris to the *1280 trial court for resentencing in light of In re Post Sentencing Review of Charles.[2]
Lewis Brown Incident
Porsche Washington asked Lewis Brown to meet her at a motel in Seattle. Lewis went there at around 2 A.M. At Porsche's request, Lewis removed his clothes. Then Jacob Brown, Marshall Harris, and Tesino Barber came out of the bathroom.[3] Jacob hit Lewis in the chest with his fist, and Barber hit Lewis in the face with a gun. They went through Lewis's clothes and took his gun, watch, rings, cell phone, and other personal belongings. Barber then inserted a dildo into Lewis's anus and mouth, and burned Lewis's upper arm with a hot iron. Harris blocked the door to the motel room throughout the incident, and threatened to beat Lewis.
The men then told Lewis to get dressed. Barber and Lewis left the motel room and went to Lewis's car. Barber drove Lewis's car to the Rainier Valley area, told Lewis to get out, and drove away. Lewis walked to a nearby convenience store and called 911. He was taken to a hospital and treated for lacerations and burns.
Thomas Boyd Incident
Shortly after midnight, police responded to reports of four gunshots at a residence in Auburn. Witnesses saw a sedan driving away and a woman fleeing on foot. Police officers investigated the residence and found the body of a man lying just inside the front door. The man was later identified as Thomas Boyd. There was gunpowder residue and a graze mark from a bullet on the front door. The officers also found signs of a disturbance inside the house, but it appeared that nothing had been taken.
Two weeks later, Porsche Washington was arrested on another matter. She gave a statement concerning Boyd's shooting. Based on the statement, the police confirmed that a long-barreled .22 caliber revolver had been recovered from under the passenger seat of Jacob Brown's car during an earlier traffic stop. A ballistics examiner compared the bullets and marks found at the Boyd murder scene with the gun recovered from Brown's car in an attempt to determine whether they matched, but the results were inconclusive.
Brown was arrested and, over the next several days, gave several conflicting statements concerning the Boyd shooting. First, Brown claimed that he and Washington had been invited to Boyd's home. Washington got up to use the restroom, and Brown heard what sounded like a man holding his hand over her mouth. Brown jumped up, and Boyd suddenly attacked him. Brown was scratched and bitten on the hand and face. Boyd picked Brown up and dropped him outside on the patio. Brown then ran to his car and drove to a nearby donut shop, where he paged Washington. Brown claimed that he hadn't heard shots and that he didn't know how Boyd was shot. In Brown's second statement to the police, he claimed that Washington was a prostitute and that he had taken her to Boyd's house for that purpose. He initially reiterated his claim that he hadn't heard any gunshots, but then stated that he may have heard one or two shots when starting his car. Next he claimed that he heard gunshots while running past Washington in the front yard. Finally, he asserted that Washington was standing in the front yard while he struggled on the porch with Boyd, that he heard the shots coming from Washington's direction, and that Washington admitted shooting Boyd. In Brown's third statement, when asked exactly why he and Washington went to Boyd's house, Brown admitted that they were trying to "get some money." When asked how they usually got money, Brown explained that Washington would set up the situation with men she had met while prostituting:
Normally, we look at the person to see you know, [a], if he's a sucker, you know. I mean is hecan conversation get him to abide by what we asked.... Just start talking to him and then have thethe female was all readythe female was there to advocate it for everything. She's the one who, to make the man think that they are going to have sexual activity, *1281 whatever. Then I will just come through and act likeyou know, what I'm saying I was a smoker. A smoker means a guy that smokes crack and acts all hysterical. And he like, man, let me borrow some money or let me have $15-$20, so I can get a hit.
Brown indicated that a normal reaction is for the man to give him the money to make him leave, and that Washington would provide encouragement if necessary. When asked what Brown would do if the man resisted, Brown said, "I would play the role, and I would really freak and stressing and get hysterical.... And then I wasI was freaking, so I'm not going to leave until he gave me $5, $10, $15.... So that's how we work it, just like that." Brown claimed that the plan was to get money through conversation, not intimidation. However, Brown said that as soon as he saw Boyd, he knew that the dope fiend role wasn't going to work with him.
Jelani and Jerel Tackett Incident
Jelani Tackett met Porsche Washington when he stopped to help her with her disabled car. The next day, Washington called Jelani and asked him to meet her. Jelani picked her up at a motel south of Seattle. She asked him to drive to another location, where they picked up Washington's friend Ramona Rigney. Jelani then went home and picked up his brother Jerel.
Washington and Rigney asked for a ride to an apartment. Rigney went in for a short time, and when she came out, she suggested that they drive to a nearby mini-market. When they arrived, Jacob Brown and Tesino Barber approached the car. Washington introduced Brown as her brother and asked for a ride to "mom's house." Jelani reluctantly agreed after Washington assured him that everything was fine.
Brown directed Jelani to another location. Brown and Washington got out and started talking behind the car, and Barber got into the front seat with Jelani. Suddenly, Brown appeared at the driver's side window and pointed a gun at Jelani's head. Jelani heard clicking noises, but the gun did not fire. Barber said, "give me your stuff, don't say nothing" and began to take Jelani's rings off. Jelani wrestled with Barber and pressed the hilt of his knife against Barber, pretending that it was a gun. Brown put his gun to Jelani's head and ordered him to release Barber. Brown then ordered Jerel and Jelani out of the car. Jerel got out. Brown grabbed Jerel, put his gun to Jerel's head, and told Jelani to get out or he would shoot Jerel. Jelani got out and Barber snatched the keys out of his hand. Brown let go of Jerel and walked a few steps away.
Jelani testified that Brown was standing about 15 feet away, pointing his gun "right at us, at me" (referring to himself and Jerel). Jelani said that Brown started running away, still "pointing the gun at me." Jelani said that when he did not move, Brown shot his gun "towards us, towards me." When asked where Brown was pointing the gun when he fired the shot, Jelani said he was "pointing it at me." Jelani demanded his keys, but Brown ran down the street and fired another shot. Jelani followed Brown, and Brown fired two more shots directly at him as they went around the corner.
Jerel also testified that Brown was standing about 15 feet away when Brown first threatened to start shooting. Jerel indicated that he wasn't standing right next to his brother at that moment, but a couple of feet to one side. Jerel said that he moved back, but that Jelani stood his ground in the middle of the street and even walked towards Jacob. Jerel testified that Brown was "pointing [the gun] at my brother" and "shot... at my brother." Jerel testified that he was standing in a different direction from Jelani when Brown fired the shots. Jerel never testified that Brown shot at him.
Trial and Sentencing
Jacob Brown was charged with first degree felony murder (count I), first degree robbery (counts II and III), first degree rape (count IV), and first degree assault (counts V, VI, and VII). Codefendant Marshall Harris was charged with first degree robbery (count III), first degree rape (count IV), and first degree assault (count VII). Each count contained a firearm allegation.
Brown and Harris were found guilty as charged on all counts. The jury answered yes to all of the firearms interrogatories. The court ordered counts I, IV, V and VII *1282 against Brown to run consecutively, with counts II and III running concurrently with the other counts. The court ordered counts IV and VII against Harris to run consecutively, with count III running concurrently. The court also imposed firearms enhancements against Brown and Harris for each count and ordered all of the enhancements to run consecutive to the underlying sentences and consecutive to one another.

II
I. Consecutive Sentencing
Brown and Harris argue that the trial court erred in imposing consecutive sentences for the rape and assault of Lewis Brown because the offenses did not constitute "separate and distinct criminal conduct" under RCW 9.94A.400(1)(b). In addition, Brown argues that the court should not have imposed consecutive sentences for the first degree assaults of Jerel and Jelani Tackett because the two assault charges arose from the same conduct. Because we reverse and dismiss Brown's conviction for first degree assault of Jerel Tackett, we need not address this latter claim here.
Brown and Harris argue that three statutory alternatives exist when sentencing for multiple current serious violent offenses. The first and largest category consists of offenses which are neither the same criminal conduct nor separate and distinct; these offenses are sentenced concurrently. The other two categories are narrow exceptions to the general rule: offenses constituting "same criminal conduct" are sentenced as a single crime, and "serious violent offenses which arise from separate and distinct conduct" are sentenced consecutively. Brown and Harris argue that their offenses nearly satisfy the "same criminal conduct" exception because they involved the same victim at the same time and place, and should therefore fall into the first category. The State contends that all offenses which do not constitute same criminal conduct must necessarily be separate and distinct. In light of the legislative history and purpose of RCW 9.94A.400, we agree with the State and affirm the consecutive sentences.
RCW 9.94A.400 enumerates criteria for determining whether multiple offenses should be sentenced consecutively or concurrently. Under RCW 9.94A.400(1)(a), concurrent sentences are the general rule:
Except as provided in (b) or (c) of this subsection, whenever a person is to be sentenced for two or more current offenses, the sentence range for each current offense shall be determined by using all other current and prior convictions as if they were prior convictions for the purpose of the offender score: PROVIDED, That if the court enters a finding that some or all of the current offenses encompass the same criminal conduct then those current offenses shall be counted as one crime. Sentences imposed under this subsection shall be served concurrently. Consecutive sentences may only be imposed under the exceptional sentence provisions of RCW 9.94A.120 and 9.94A.390(2)(g) or any other provision of RCW 9.94A.390. "Same criminal conduct," as used in this subsection, means two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim.
This sentencing structure is designed to impose greater punishment on multiple crimes while confining the increased punishment within the structure of the sentencing grid.[4] The "same criminal conduct" exception limits consideration of multiple current convictions for closely connected crimes.[5]
RCW 9.94A.400(1)(b) creates an exception by mandating that serious violent offenses arising from separate and distinct criminal conduct must be sentenced consecutively:
Whenever a person is convicted of two or more serious violent offenses, as defined in RCW 9.94A.030, arising from separate and distinct criminal conduct, the sentence range for the offense with the highest seriousness level under RCW 9.94A.320 shall be determined using the offender's prior *1283 convictions and other current convictions that are not serious violent offenses in the offender score and the sentence range for other serious violent offenses shall be determined by using an offender score of zero. The sentence range for any offenses that are not serious violent offenses shall be determined according to (a) of this subsection. All sentences imposed under (b) of this subsection shall be served consecutively to each other and concurrently with sentences imposed under (a) of this subsection.
If the rape and assault of Lewis Brown constituted serious violent offenses arising from separate and distinct criminal conduct, then the trial court properly imposed consecutive sentences on Brown and Harris. The crimes against Lewis Brown plainly qualify as "serious violent offenses."[6] However, the Legislature did not define "separate and distinct criminal conduct" in this context. The crimes fail to satisfy the "same criminal conduct" exception of RCW 9.94A.400(1)(a) because rape and assault have separate intents. Therefore, the pivotal question is whether all crimes that are not "same criminal conduct" are necessarily "separate and distinct."
An examination of the statutory antecedent to RCW 9.94A.400 indicates that the Legislature intended to insure that crimes which do not meet the "same criminal conduct" exception are necessarily "separate and distinct." Prior to 1984, sentencing for multiple crimes was governed by RCW 9.92.080(2) and (3):
(2) Whenever a person is convicted of two or more offenses which arise from a single act or omission, the sentences imposed therefor shall run concurrently, unless the court, in pronouncing sentence, expressly orders the service of said sentences to be consecutive.
(3) In all other cases, whenever a person is convicted of two or more offenses arising from separate and distinct acts or omissions, and not otherwise governed by the provisions of subsections (1) and (2) of this section, the sentences imposed therefor shall run consecutively, unless the court, in pronouncing the second or other subsequent sentences, expressly orders concurrent service thereof.
Under this statutory scheme, there were only two possible sentencing alternatives for multiple offenses. First, crimes arising from a single act or omission are sentenced concurrently or consecutively in the court's discretion. Second, "in all other cases," crimes "arising from separate and distinct acts or omissions" must be sentenced consecutively. In other words, all crimes that did not arise from a single act or omission were clearly separate and distinct. RCW 9.94A.400(1)(a) continues the policy of distinguishing closely connected crimes from those that are separate and distinct by replacing the term "single act or omission" with "same criminal conduct."[7] However, in passing the sentencing reform act of 1981, the Legislature did not further define "separate and distinct" criminal conduct, nor did it provide any other indication that it intended to create a new set of offenses that fail to meet the definition of "same criminal conduct," yet are not "separate and distinct." Therefore, we hold that under RCW 9.94A.400, crimes which fail to meet the statutory definition of "same criminal conduct" are necessarily "separate and distinct."
In support of their reading of the statute, Brown and Harris place great importance on Professor Boerner's statement that "there will be relatively few situations where [the serious violent exception] will become applicable."[8] However, this observation was based on the statutory scheme as it existed in 1985. The former version of RCW 9.94A.400(1)(b) imposed consecutive sentences "whenever a person is convicted of three or more serious violent offenses, as defined in RCW 9.94A.330, arising from separate and distinct criminal conduct...." However, the current version of RCW 9.94A.400(1)(b) reduces the required number of serious violent offenses from three to two, and the list of crimes that qualify as "serious violent offenses" has increased significantly.[9] Thus, it is clear that in amending RCW *1284 9.94A.400, the Legislature intended to greatly expand application of the serious violent offender rule.
We hold that, under RCW 9.94A.400, crimes which do not constitute "same criminal conduct" are necessarily "separate and distinct." Therefore, the rape and assault of Lewis Brown were serious violent offenses that constituted separate and distinct criminal conduct, and the trial court properly imposed consecutive sentences on Brown and Harris.
The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.
KENNEDY, C.J., and ELLINGTON, J., concur.
NOTES
[1] State v. Petrich, 101 Wash.2d 566, 572, 683 P.2d 173 (1984).
[2] 135 Wash.2d 239, 955 P.2d 798 (1998).
[3] Lewis Brown did not know his assailants. He identified them later from photomontages.
[4] David Boerner, Sentencing in Washington 5-16 (1985) (referring to the 1985 version of RCW 9.94A.400(1)(a)).
[5] Boerner at 5-16.
[6] RCW 9.94A.030(34)(a).
[7] RCW 9.94A.400(1)(a); Boerner at 5-16.
[8] Boerner at 5-19.
[9] The former version included only five crimes: first and second degree murder, first degree assault, first degree kidnapping and first degree rape. The current statute, RCW 9.94A.030(31), expands this list to include homicide by abuse, first degree manslaughter, assault of a child in the first degree, or an attempt, criminal solicitation, or criminal conspiracy to commit one of these felonies; or any federal or out-of-state conviction that would constitute a serious violent offense in Washington.