[No. 45550-8-I. Division One. November 26, 2001.]

*In the Matter of the Personal Restraint of* CESAR FRASCO SARAUSAD II, *Petitioner.*

---

[17] *State v. Collins*, 110 Wn.2d 253, 751 P.2d 837 (1988).

*Patricia S. Novotny*, for petitioner.

*Norm Maleng, Prosecuting Attorney*, and *Deborah A. Dwyer* and *Lee D. Yates, Deputies*, for respondent.

KENNEDY, J. — Following a drive-by shooting, Cesar Sarausad II was convicted of second degree (intentional) murder, two counts of attempted murder in the second degree, and assault in the second degree while armed with a firearm. We affirmed his conviction on direct appeal in an unpublished opinion.[1] In this personal restraint petition, Sarausad contends, inter alia, that although the accomplice liability instructions given at his trial complied with the requirements of *State v. Roberts*, 142 Wn.2d 471, 14 P.3d 713 (2000), an additional clarifying instruction should have been given, based on the State's "in for a dime, in for a dollar" argument to the jury and subsequent inquiries from the jury indicating confusion as to the mental state required for accomplice liability. Sarausad also contends that

---

[1] *State v. Ronquillo*, Nos. 35840-5-I and 35875-8-I (consolidated) (Wash. Ct. App. Mar. 2, 1998), *review denied*, 136 Wn.2d 1018 (1998).

the evidence at trial was insufficient to support his conviction as an accomplice to actual and attempted murder. Although we examined these same issues in the direct appeal, Sarausad argues, and we agree, that we should reexamine the record in light of *Roberts*. But having done so, we conclude that the evidence was substantial that Sarausad knowingly facilitated the drive-by shooting. Moreover, contrary to Sarausad's contention here, the prosecutor did *not* ask the jury to convict Sarausad as an accomplice to murder, attempted murder and assault on any other basis than that he knowingly facilitated the drive-by shooting. This being so, the trial court did not abuse its discretion in responding to the jury inquiries as it did. Accordingly, we dismiss Sarausad's personal restraint petition.

## FACTS

Cesar Sarausad II, Brian Ronquillo, and Jerome Reyes were charged with and tried together for first degree (premeditated) murder of Melissa Fernandes, attempted first degree murders of Ryan Lam and Tam Nguyen, and second degree assault of Brent Mason, all in the course of a drive-by shooting at Ballard High School on March 23, 1994.[2] Brian Ronquillo, the shooter, was found guilty of one count of first degree (premeditated) murder, two counts of attempted first degree murder and one count of second degree assault while armed with a firearm. Cesar Sarausad, who drove the car to and from the shooting, was found guilty of the lesser included offenses of one count of second degree (intentional) murder, two counts of attempted second degree murder, and second degree assault

---

[2] The three were also charged, in the alternative, with second degree felony murder of Melissa Fernandes. The jury was instructed not to consider that count as to any defendant whom they convicted of first degree murder or the lesser included offense of second degree intentional murder. The jury did not reach the felony murder count as to any defendant. We note in passing that Sarausad's judgment and sentence indicates that he was convicted under the statute number for second degree felony murder, but this was clearly a scrivener's error, in that the remainder of the record shows conclusively that he was convicted of second degree intentional murder.

while armed with a firearm. The jury was unable to reach a verdict as to Jerome Reyes, and a mistrial was declared as to him.

Sarausad, Ronquillo and Reyes were associated with a gang called the "23rd Street Diablos" (Diablos). Reyes told members of the Diablos that, two days before the shooting, he had been chased from the vicinity of Ballard High School by members of a rival gang, the "Bad Side Posse" (BSP). Nine members of the Diablos went in two cars to Ballard High School to confront the BSP. Sarausad drove one of the cars.

The Diablos arrived at the school and confronted some members of the BSP. A shoving match ensued during which gang signs were flashed and harsh words were exchanged. The Diablos left after someone indicated that police were nearby.

The Diablos went to a member's house where they listened to music, ate and initiated a new member into the gang. Ronquillo obtained a handgun from a fellow Diablo and put it into his pants. The Diablos returned to Ballard High School, again riding in two cars. Sarausad drove again, and his car was in the lead. Ronquillo was in the front passenger seat with Sarausad. Three other Diablos were in the back seat of Sarausad's vehicle: Jerome Reyes, Luke Gosho and Michael Marckx. Marckx and Gosho both testified that "capping" (shooting) was mentioned during the trip back to the school. Upon approaching the school, the two carloads pulled side by side and there was a brief discussion. Sarausad said, "Are you ready?"

Ryan Lam, Tam Nguyen and Melissa Fernandes were standing outside the school when the two cars approached. Sarausad drove his car past the students, slowing momentarily as Ronquillo, wearing a bandana tied over his nose and mouth, pointed a handgun out the open car window and pulled the trigger at least 6 and as many as 10 times. According to a State's expert witness, the bullets were fired directly at the students. Lam and Nguyen ducked to the ground and were unscathed. Fernandes died the next day

from a penetrating wound on the left side of her head. Brent Mason, another student in the vicinity, was hit in the leg by a bullet fragment.

Sarausad, still in the lead, sped away and the other vehicle followed. Some distance from the school, both cars stopped and Ronquillo transferred the gun to the other car. Sarausad drove the Diablos that were in his car to Northgate Mall, dropped them off, and then drove home. The next day, after a discussion with Ronquillo, a fellow Diablo threw the chopped-up handgun into a lake, and it was never recovered.

The State's theory at trial, bolstered by testimony of an expert witness, was that gang mentality required the Diablos to regain respect after one of their own, Reyes, was chased out of BSP territory. The first trip to Ballard High School, ending abruptly as it did by reason of proximity of police, did not sufficiently serve that purpose, and so the gang went back to the school, this time to carry out a drive-by shooting—a certain means of regaining respect. The State entered into plea bargains with several of the gang members, agreeing to reduce the charges against them in exchange for their truthful testimony at the trial of Ronquillo, Sarausad and Reyes, who, the State argued, were the primary instigators of the drive-by shooting.

The defense theories at trial were as follows: Ronquillo admittedly was the shooter but he neither premeditated nor intended to kill and was, therefore, guilty only of manslaughter. Sarausad and Reyes returned to the school expecting, at most, another shoving match or fistfight, had no idea whatsoever that Ronquillo had armed himself for the return trip and were totally and utterly dismayed when Ronquillo started shooting. Nothing was preplanned, there was no discussion of shooting anybody, nobody in Sarausad's car knew Ronquillo was armed and none of them saw Ronquillo tie on the bandana. Finally, the defense team argued that the gang members who testified for the State were bald-faced liars trying to save their own skins.

Such additional facts as may be necessary to clarify our opinion will be set forth below.

## DISCUSSION

■■ To obtain relief in this personal restraint petition, Sarausad must show that he was actually and substantially prejudiced either by a violation of his constitutional rights or by a fundamental error of law. *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 884-85, 952 P.2d 116 (1998). Sarausad contends that the case was tried on a mistaken view of accomplice liability, one that allowed the State to argue to the jury that Sarausad was an accomplice to murder even if he meant only to facilitate another shoving match and exchange of gang signs—the "in for a dime, in for a dollar" theory of accomplice liability. Thus, Sarausad argues, the State was relieved of its obligation to prove the mental state required of an accomplice, an error of constitutional proportions. And he was prejudiced, Sarausad contends, because the evidence was insufficient to prove that he knew that he was facilitating "the crime" of murder as opposed to "a (any) crime" such as a misdemeanor level assault. Even though the accomplice liability instructions here mirrored the statute and thus did not suffer from the fatal flaw in *State v. Roberts*, 142 Wn.2d 471, 14 P.3d 713 (2000), the jury sent out inquiries three separate times during deliberation requesting clarification of the mental state required of an accomplice, only to be told each time to reread the same instructions already given. Because Sarausad asked for a supplemental instruction and his request was denied, he argues that the trial court abused its discretion—particularly in light of the State's closing arguments to the jury, which Sarausad contends misstated the law of accomplice liability as now defined in *Roberts*.

Although Sarausad raised these same issues in the direct appeal, he points out, and correctly so, that this court decided that appeal on the premise that "in for a dime, in for a dollar" correctly characterized Washington accomplice

liability law. We said that "an accomplice, 'having agreed to participate in a criminal act, runs the risk of having the primary actor exceed the scope of the preplanned illegality.' " *State v. Ronquillo*, Nos. 35840-5-I and 35875-8-I, slip op. at 28-29 (Wash. Ct. App. Mar. 2, 1998) (quoting *State v. Davis*, 101 Wn.2d 654, 658, 682 P.2d 883 (1984) (citing *State v. Carothers*, 84 Wn.2d 256, 525 P.2d 731 (1974)). We also said that "sufficient evidence was presented to support Sarausad's conviction under a correct interpretation of the accomplice liability statute" and that although there was circumstantial evidence suggesting that Sarausad had such knowledge, "it was not necessary for the State to prove Sarausad knew Ronquillo had a gun, or knew that there was a potential for gunplay that day." *Ronquillo*, slip op. at 3, 32. We agree with Sarausad that, in all fairness, we should take another look at these issues in light of *Roberts*.

### Accomplice Liability Clarified

 After our disposition of Sarausad's direct appeal, our Supreme Court in *State v. Roberts* clarified accomplice liability law by holding that the putative accomplice must have acted with knowledge that his or her conduct would promote or facilitate "the crime" for which he or she is eventually charged, and that knowledge of " 'a crime' does not impose strict liability for any and all offenses that follow." 142 Wn.2d at 513; *see also State v. Cronin*, 142 Wn.2d 568, 579, 14 P.3d 752 (2000). Thus, an accomplice liability jury instruction that allowed liability to attach if the jury found that the person was an accomplice in the commission of "a crime" as opposed to "the crime" was erroneous because it departed from Washington's accomplice liability statute.[3] *Roberts*, 142 Wn.2d at 513.

The *Roberts* court explained that the language in *Davis*, 101 Wn.2d at 658, stating that an accomplice, having

---

[3] The relevant portion of RCW 9A.08.020 states: "A person is guilty of a crime if it is committed by the conduct of another person for which he is legally accountable. . . . A person is legally accountable for the conduct of another person when . . . [h]e is an accomplice of such other person in the commission of *the crime*." (Emphasis added.)

agreed to participate in a crime, runs the risk that the principal actor will exceed the scope of the preplanned illegality, was not intended to impose strict liability on putative accomplices for any and all crimes but rather was intended to reaffirm the longstanding rule that an accomplice need not have specific knowledge of every element of the crime committed by the principal, provided that he, the accomplice, has general knowledge of that specific crime. *Roberts*, 142 Wn.2d at 511-12. The Legislature intended that an accomplice " 'have the purpose to promote or facilitate *the particular conduct that forms the basis for the charge*' " and the accomplice " *'will not be liable for conduct that does not fall within this purpose.'* " *Id.* at 510-11 (quoting from the comment to Model Penal Code § 2.06(3)(a), which is identical to RCW 9A.08.020(3)(a)).

"The crime" means the charged crime, but because only general knowledge is required, even if the charged crime is aggravated, premeditated first degree murder as it was in *Roberts*, "the crime" for purposes of accomplice liability is murder, regardless of degree. This is made clear in *Cronin*, 142 Wn.2d at 581-82, wherein the court said that the State had to prove beyond a reasonable doubt that Cronin, who was charged with premeditated first degree murder, had knowledge that he was aiding in the commission of the crime of murder. And in *State v. Bui*, consolidated with *Cronin*, the charge was assault in the first degree and it was charged additionally that "firearms and deadly weapons" were used in committing the crime. 142 Wn.2d at 571-72.[4] The court said that in order to show that Bui was an accomplice to these charged crimes the State had to prove beyond a reasonable doubt that he possessed general knowledge that the crime he was facilitating was assault. *Id.* at 580.

---

[4] In *Bui*, two cars loaded with members of a gang met up with two cars loaded with members of a rival gang. After gang signs were flashed, two of the men in the car that Bui was driving got out of his car carrying firearms and riddled the cars of the rival gang with bullets, wounding two of them but killing none of them. 142 Wn.2d at 570-72.

The jury in that case inquired whether Bui had to know whether he was aiding first degree assault or a crime of any kind and the trial court responded that Bui needed to know " 'the general nature of the crime that will occur.' " Although this is correct in the abstract, the Supreme Court was concerned that the jury might not have understood from this supplemental instruction that the State had to prove that Bui was aware he was facilitating a physical confrontation between the two gangs, as opposed to merely a verbal confrontation. Thus the supplemental instruction did not cure the instructional error. *Id.* at 581.

From this, we conclude that the law of accomplice liability in Washington requires the State to prove that an accused who is charged as an accomplice with murder in the first degree, second degree or manslaughter knew generally that he was facilitating a homicide, but need not have known that the principal had the kind of culpability required for any particular degree of murder. Likewise, an accused who is charged with assault in the first or second degree as an accomplice must have known generally that he was facilitating an assault, even if only a simple, misdemeanor level assault, and need not have known that the principal was going to use deadly force or that the principal was armed.

Because the *Roberts* court specifically adhered to its ruling in *Davis*, we also conclude that the statement in *Davis* that an accomplice takes the risk that the principal may exceed the scope of the preplanned crime still has meaning, having to do with the degree of the crime. In *Davis*, the defendant-accomplice and the principal planned a strong-arm robbery but the accomplice did not know the principal was armed. As now clarified, the *Davis* court said that it did not matter that the accomplice was unaware that the principal was armed because the accomplice took the risk that the principal would exceed the scope, that is, escalate the degree of the preplanned robbery. 101 Wn.2d at 658.

SARAUSAD'S CONTENTIONS

■ Applying this clarification to Sarausad's petition, the obvious question is this: Presuming that the State presented substantial evidence from which the jury could find beyond a reasonable doubt that Sarausad knowingly facilitated a drive-by shooting, is that a sufficient basis to find him guilty as an accomplice to murder for the death of Fernandes, the attempted murders of Lam and Nguyen and the assault of Brent Mason? We conclude that it is. As the *Roberts* court observed, our Legislature intended to impose accomplice liability upon those having " 'the purpose to promote or facilitate *the particular conduct that forms the basis for the charge*' " and not to impose such liability " 'for conduct that does not fall within this purpose.' " 142 Wn.2d at 510-11 (quoting MODEL PENAL CODE § 2.06 cmt. 6(b) (1985)). The particular conduct that formed the basis for the charged crimes here was the drive-by shooting. The State had to prove that Sarausad knowingly facilitated the drive-by shooting; it did not have to prove that Sarausad knew that Ronquillo had formed the premeditated intent to kill rival gang members. In order to promote a drive-by shooting, a putative accomplice necessarily must know that the principal was armed. Thus, when we concluded in the direct appeal that "it was not necessary for the State to prove Sarausad knew Ronquillo had a gun, or knew that there was a potential for gun play that day" we erred. Under *Roberts*, that is exactly what the State had to prove.

This reasoning comports with the statutory definition of "knowledge," which is the mens rea required of an accomplice. RCW 9A.08.020(3)(a); *Roberts*, 142 Wn.2d at 510. RCW 9A.08.010(1)(b) defines "knowledge" in the following terms: A person acts knowingly or with knowledge when he or she is aware of a fact, facts, or circumstances or result described by a statute defining an offense; or he or she has information that would lead an ordinary person in the same situation to believe that facts exist that are described by a

statute as defining an offense.[5] A rational trier of fact reasonably could base accomplice liability for a murder, an assault, or both, on its determination that an ordinary person would know that a drive-by shooting is likely to result in the death or injury of one or more people—and thereby infer that a given defendant who knowingly facilitated a drive-by shooting thereby knowingly facilitated the murder, attempted murders and assaults that resulted from the drive-by shooting.[6]

■■ With all of this in mind, we now turn our attention to Sarausad's contentions for this personal restraint petition. As we have noted, the accomplice liability instructions at Sarausad's trial complied with *Roberts* and the Washington accomplice liability statute.[7] Jury instructions are sufficient if they are supported by substantial evidence, allow the parties to argue their theories of the case and when read as a whole properly inform the jury of the applicable law. *State v. McLoyd*, 87 Wn. App. 66, 71, 939

---

[5] The knowledge statute must be interpreted as only permitting rather than directing the jury to find that the defendant had actual knowledge if it finds that the ordinary person would have had knowledge under the circumstances. The jury must still be allowed to conclude that the defendant was less attentive or intelligent than the ordinary person and, therefore, lacked actual, subjective knowledge. *State v. Shipp*, 93 Wn.2d 510, 516, 610 P.2d 1322 (1980).

[6] It seems clear from the record that Sarausad's counsel understood this premise, for he tried vigorously to persuade the jury that Sarausad, who performed well in school and who clearly had great potential for success in life, would not have been so stupid as to have returned to Ballard High School if he had known Ronquillo was armed and contemplating a shooting.

[7] Instruction 45 states: "You are instructed that a person is guilty of a crime if it is committed by the conduct of another person for which he is legally accountable. A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of the crime." And Instruction 46 states in pertinent part:

A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either

(1) solicits, commands, encourages, or requests another person to commit the crime or

(2) aids or agrees to aid another person in planning or committing the crime.

The word "aid" means all assistance whether given by words, acts, encouragement, support or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.

P.2d 1255 (1997), *aff'd sub nom. State v. Studd*, 137 Wn.2d 533, 973 P.2d 1049 (1999). Under that standard, the accomplice liability instructions here at issue are sufficient.

Nevertheless, at Sarausad's trial the jury inquired three separate times during deliberations, indicating confusion with respect to the mens rea required for accomplice liability. On the first occasion, the jury asked whether the element of "intent" in several of the to-convict instructions applied only to the defendant or to both the defendant and his accomplice. On another day, the jury asked essentially the same question with respect to the to-convict instruction for second degree murder. And finally the jury sent out this inquiry: "We are having difficulty agreeing on the legal definition and concept of 'accomplice.' Question: When a person willing[ly] participates in a group activity, is that person an accomplice to any crime committed by anyone in the group?" On each of these occasions, the court replied by instructing the jury to reread various instructions, including the accomplice liability instructions, together with the instructions as a whole. The court denied Sarausad's request for a response to the third inquiry that would either simply answer "no" or that would tell the jury that in order to be an accomplice one must "(1) promote or facilitate the crime being considered by the actor, (2) the actor must have the mental state required for the crime, and (3) the accomplice must know that the actor had the required mental state."[8]

Sarausad vigorously argues that under the unique facts of this case, the trial court's failure to provide a supplemental instruction in response to the jury's persistent inquiries relieved the State of its burden to prove its case beyond a reasonable doubt—notwithstanding that the accomplice liability instructions complied with the requirements of *Roberts*—because of the way that the prosecutor argued the case to the jury. He contends that because his trial took

---

[8] Sarausad admits that this proposed supplemental instruction overstates the mens rea required of an accomplice as defined in *Roberts*. Suppl. Reply Br. in Supp. of Pers. Restraint Pet. at 7 n.4.

place before *Roberts* was handed down, the prosecutor erroneously assumed, and argued, that the jury could find Sarausad guilty as an accomplice to murder if he had the purpose to facilitate an offense of any kind whatsoever, even a shoving match or fistfight.

But this is not an accurate description of the prosecutor's actual argument. During closing, the prosecutor said:

> Under the laws of the State of Washington, people who help commit crimes, people who set the wheels in motion, people who assist in the commission of crimes are called accomplices or aiders and abettors, as we more commonly know them to be. And in the eyes of the law, you are no less guilty because you drive the getaway car or because you solicit a crime to occur. You're no less guilty for helping than you are for pulling the trigger.
>
> The defendants, Mr. Sarausad and Mr. Reyes, are classic accomplices. And let's talk a little bit about the law of accomplice liability as it exists in this state. . . . [Instruction 45] essentially says that you are instructed that a person is guilty of a crime if it is committed by the conduct of another person for which he is legally accountable. A person is legally accountable for the conduct of another when he is an accomplice. And there's another instruction right behind it [Instruction 46] which breaks down all the ways somebody can assist or aid in the commission of a crime, solicit, command, encourage, request another person to commit a crime, aid or [agree] to aid, presence at the time the crime is occurring or readiness to assist.
>
> In fact, accomplice liability is such that a person can be an accomplice to a crime whether they're present or not when the crime occurs. I'll give you a good example. The defendant, Mr. Reyes, by setting the wheels in motion, by simply calling his friends, getting them together, saying, "Let's go avenge this problem," he's an accomplice. You call somebody up on the phone and you tell them to go do something, "Go commit this crime and report back to me," and the person does it, you are an accomplice. If you wait outside the bank while somebody's robbing it and all you're doing is driving, you are an accomplice.
>
> The law of accomplice liability is such that the person who assists doesn't even have to have the same intentions as the

actual person who is committing the crime. You have to be present, you have to be ready to assist. And you have to know that your assistance is causing the crime to unfold.

Let me give you a good example of accomplice liability. A friend comes up to you and says, "Hold this person's arms while I hit him." You say, "Okay, I don't like that person anyway." You hold the arms. The person not only gets assaulted, he gets killed. You are an accomplice and you can't come back and say, "Well, I only intended this much damage to happen." Your presence, your readiness to assist, caused the crime to occur and you are an accomplice. The law in the State of Washington says, if you're in for a dime, you're in for a dollar. If you're there or even if you're not there and you're helping in some fashion to bring about this crime, you are just as guilty.

. . . .

The defendant, Mr. Sarausad, classic accomplice in this case. He's the driver, he's the wheelman. He allowed Mr. Ronquillo to fire those shots. And you recall, witness after witness after witness described how the defendant, Mr. Sarausad, drove that car, ladies and gentlemen, fast at first. And, in fact, toward the end, even Mr. Cooke described the swooping motion, which is what each and every witness described in different ways in this case. The car slowed down on the dime, slowed down before the shots were fired, stayed slowed down until the shots were over and immediately sped up. Mr. Sarausad allowed this crime to occur by driving in the fashion he did alone.

Report of Proceedings at 3009-13.

And then in rebuttal argument:

I want to talk to you finally about the accomplice liability instruction. I think it just bears comment, and I promise I will sit down and this case will soon be yours to decide. The defendant, Mr. Sarausad's lawyer says that an accomplice has to have the same mental state as the person doing the shooting. Cesar Sarausad, Jerome Reyes also had to have premeditated intent. Not true, not true. And that's not what the instruction says.

And I've told you the old adage, you're in for a dime, you're in for a dollar. If their logic was correct, they're not ever an accomplice to anything. The getaway driver for a bank robbery

would say, "I just told him to rob them, I didn't tell him to shoot him, I didn't do anything." The example I gave you earlier, "I just told my friend to hold the arms down of this person while he hit him, I didn't tell him to kill him, I'm not guilty of anything." If you're in for a dime, you're in for a dollar.

When they rode down to Ballard High School that last time, I say they knew what they were up to. They knew they were there to commit a crime, to disrespect the gang, to fight, to shoot, to get that respect back. A fist didn't work, pushing didn't work. Shouting insults at them didn't work. Shooting was going to work. In for a dime, you're in for a dollar.

The defendant, Mr. Ronquillo did not act alone. He acted with the assistance of the driver, Mr. Sarausad[.]

Report of Proceedings at 3134-35.

Sarausad argued for the direct appeal that an accomplice must share the same mental state as the principal. In the course of rejecting that proposition, we said that accomplice liability "in Washington has been reduced to the maxim, 'in for a dime, in for a dollar.'" *Ronquillo*, Nos. 35840-5-I and 35875-8-I, slip op. at 3. Given the nature of Sarausad's contentions for the direct appeal, it was not necessary for us to closely examine what the prosecutor actually said during closing arguments. Having done so now, we observe that the prosecutor did *not* in fact argue that even if Sarausad drove to Ballard High School the second time having the purpose to facilitate only another shoving match or a fistfight, he nevertheless was guilty of murder. As can be seen from the above excerpts, the prosecutor assigned a different meaning to the phrase "in for a dime, in for a dollar," using that phrase to signify the gang mentality that led to this crime—the mentality that an affront to one Diablo is an affront to all that must be avenged to restore respect to the gang no matter the means. The prosecutor effectively argued that Sarausad and the other Diablos were "in for a dime" on the first trip to Ballard High School where the pushing and shoving took place, and when that proved insufficient to restore the gang's lost respect, Sarausad and the other Diablos were "in for a dollar" on the second trip to Ballard High School for the purpose of shooting.

We also observe that the prosecutor's robbery hypothetical probably would pass muster under the now-clarified ruling in *Davis*, for it is based on essentially the same facts: "I only told him to rob him I didn't tell him to shoot him" seems virtually indistinguishable from "I only planned to participate in a strong-arm robbery, I didn't know my cohort was armed"—so long as the person shot during the robbery does not die from the wound—as he seemingly did not in the prosecutor's hypothetical. If the person does die, the *Roberts* court said that felony-murder would be the appropriate charge. 142 Wn.2d at 511 n.14 (citing RCW 9A.32.030(1)(c); *State v. Osborne*, 102 Wn.2d 87, 93, 684 P.2d 683 (1984)). The "hold his arms while I hit him" hypothetical may or may not be problematic under *Roberts*. On the one hand, the hypothetical accomplice in this illustration certainly " 'facilitate[d] *the particular conduct that form[ed] the basis for the charge.*' " *Roberts*, 142 Wn.2d at 510-11 (quoting MODEL PENAL CODE § 2.06 cmt. 6(b) (1985)). On the other hand, in *Roberts* and *Cronin* our high court was concerned that the jury may have based accomplice liability for murder on the purported accomplice's purpose to facilitate a robbery, not a homicide, so that in this hypothetical, the putative accomplice might better have been charged with felony murder.

■ But to resolve this personal restraint petition, we need not decide the prosecutor's hypothetical cases but rather the case at hand. Viewing the prosecutor's accomplice liability arguments as a whole, we conclude that even if one or both of the prosecutor's hypothetical illustrations were to fail the *Roberts* "a crime-the crime" test for knowing facilitation outside the felony-murder context, Sarausad was not prejudiced. This is because the court properly instructed the jury as to the law of accomplice liability and because the prosecutor made it crystal clear to the jury that the State wanted Sarausad found guilty of first degree murder, first degree attempted murder and second degree

assault[9] because he knowingly facilitated the drive-by shooting and for no other reason. Not once did the prosecutor suggest to the jury that it could or should convict Sarausad even if it believed that he returned to Ballard High School for the purpose of facilitating nothing more than another shoving match or a fistfight—the very means of regaining respect that had failed during the first trip to the school.

Thus, whatever the basis for the jury's confusion may have been, the accomplice liability instructions were sufficient, and nothing that the prosecutor argued to the jury required a remedial or supplemental instruction from the trial court.[10] Thus, we adhere to our ruling in the direct appeal that the trial court properly exercised its discretion in denying Sarausad's request for clarifying instructions.

SUFFICIENCY OF THE EVIDENCE

Sarausad contests the sufficiency of the evidence to convict him as an accomplice in light of *Roberts*; that is, he contends that there was insufficient evidence that he knowingly facilitated the drive-by shooting as opposed to just a minor physical confrontation. We disagree. Gosho and Marckx testified that "capping" was discussed on the return trip to the school. At some point before the shooting, Ronquillo tied a bandana over the lower part of his face and pulled the gun out of his pants.[11] While parked side by side with the other carload of Diablos, Sarausad said, "Are you

---

[9] The prosecutor went for broke as it were, never mentioning during closing or rebuttal arguments the lesser included offenses to the murder and attempted murder charges or the alternative charge of felony murder.

[10] We note that during Sarausad's closing, his counsel argued that in order to convict Sarausad of premeditated murder as an accomplice, the State had to prove beyond a reasonable doubt that Sarausad knew Ronquillo had premeditated intent to murder someone, and that the same was true as each of the lesser included charges. Report of Proceedings at 3073. The prosecutor responded during rebuttal that an accomplice does not have to have the same intent as the shooter. Report of Proceedings at 3134.

[11] Even one of the defense attorneys argued during closing that it begged reason that five teenagers in a car wouldn't know that one of their number was carrying a handgun, and that none of them would have noticed when Ronquillo tied the

ready?" Sarausad then drove the car in such a manner as to facilitate a drive-by shooting, not in such a manner as to stop, park the vehicle and engage in fisticuffs. An expert in gangs testified about the kind of gang mentality that requires the gang to avenge its honor when one of its members is disrespected by a rival gang, and that causes the gang members to see violence as an acceptable means of regaining lost respect. This evidence, although circumstantial in nature, when viewed in the light most favorable to the State is sufficient to allow a rational jury reasonably to infer that Sarausad knowingly facilitated the drive-by shooting. Sarausad argues that the substantial evidence standard[12] does not apply because of the trial court's failure to respond to the jury inquiries with something more than telling them to reread the instructions already given. But we have determined, both on direct appeal and for this personal restraint petition, that the trial court did not err in this regard.

Sarausad has failed to meet the heavy burden required of a personal restraint petitioner to show actual and substantial prejudice from a violation of his constitutional rights or from a fundamental error of law.

## BRIBERY, DOUBLE JEOPARDY AND CONSECUTIVE SENTENCING

Next, Sarausad argues that (1) the State violated RCW 9A.72.090, the bribery statute, by offering to make lenient recommendations to his cohorts in exchange for their truthful testimony;[13] (2) his protection against double jeopardy was violated when he was charged and convicted for one count of actual murder and two counts of attempted mur-

---

bandana over the lower part of his face and head and pulled out the handgun. Report of Proceedings at 3116-17. Defense counsel raised this point to show that Gosho and Marckx had to be lying. The jury was free to draw its own inferences.

[12] We view the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found all essential elements of the crime beyond a reasonable doubt. *State v. Galisia*, 63 Wn. App. 833, 839, 822 P.2d 303 (1992).

[13] Sarausad also raises a subsidiary argument regarding the court's failure to grant a requested cautionary jury instruction on accomplice testimony.

der, involving different victims; and (3) the trial court erred in concluding that he was required to serve consecutive sentences for the murder and attempted murder convictions under the "serious violent" exception in former RCW 9.94A.400(1)(b) (2000). We will examine each of these contentions in turn.

BRIBERY STATUTE

Sarausad argues that the State violated RCW 9A.72.090, the bribery statute, because the State agreed to reduce charges and recommend leniency as to several of Sarausad's cohorts in exchange for their truthful testimony at his trial. Sarausad further argues that his trial counsel was ineffective for failing to object to the admission of such testimony.

RCW 9A.72.090(1)(a) states:

A person is guilty of bribing a witness if he or she offers, confers, or agrees to confer any benefit upon a witness or a person he or she has reason to believe is about to be called as a witness in any official proceeding or upon a person whom he or she has reason to believe may have information relevant to a criminal investigation . . . with intent to . . . [i]nfluence the testimony of that person[.]

Sarausad relies on *United States v. Singleton*, 144 F.3d 1343 (10th Cir. 1998) to support his argument. There, a three-judge panel of the court held that 18 U.S.C. § 201(c)(2), the federal antigratuity statute,[14] applied to prohibit federal prosecutors from offering leniency to witnesses in exchange for their testimony. As Sarausad acknowledges, the case was subsequently overrruled en banc by *United States v. Singleton*, 165 F.3d 1297 (10th Cir.) (*Singleton* II), *cert. denied*, 527 U.S. 1024 (1999). In *Singleton* II, the Tenth Circuit interpreted § 201(c)(2) to hold that

---

[14] 18 U.S.C. § 201(c)(2) states in relevant part: "Whoever . . . directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial . . . before any court . . . shall be fined under this title or imprisoned for not more than two years, or both."

the statute did not apply to the United States government in its prosecutorial capacity. *Singleton* II reasoned that the use of the word "whoever" in the statute could not apply to the United States government, an inanimate entity. 165 F.3d at 1300. Further, the court reasoned that "applying the statute to the government would deprive the sovereign of a recognized or established prerogative, title, or interest," because the "ingrained practice of granting lenience in exchange for testimony has created a vested sovereign prerogative in the government." *Id*. at 1301. The court further concluded that "in light of the longstanding practice of leniency for testimony, we must presume if Congress had intended · that section 201(c)(2) overturn this ingrained aspect of American legal culture, it would have done so in clear, unmistakable, and unarguable language." *Id*. at 1302.

As did the *Singleton* II court, we reject the notion that the Legislature intended RCW 9A.72.090 to apply to the State's long-established practice of offering leniency to accomplices for truthful testimony. The Legislature certainly is aware that such plea bargains are often the only means of convicting principals. Moreover, to be guilty of a violation under RCW 9A.72.090(1)(a), one must intend to "influence" the testimony of a person upon whom a benefit is conferred. "Influence" means "to affect or alter the conduct, thought or character of by indirect or intangible means; . . . to have an effect on the condition or development of: determine partially: modify." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1160 (1969). "Bribe" refers to "a price, reward, gift, or favor bestowed or promised with a view to pervert the judgment or corrupt the conduct." *Id*. at 275. Thus, in the context of the bribery statute, to intend to influence a witness's testimony connotes an intention to alter the truthful nature of that testimony or to thwart the ends of justice. The State commits no violation under the statute when it offers a witness leniency in exchange for truthful testimony.

Sarausad nevertheless argues that "influence" cannot be read so narrowly and must be read to include a prosecutor's intent to induce truthful testimony where a witness would otherwise be disinclined—absent the incentive of leniency—to truthfully testify. Both the legislative history of RCW 9A.72.090, and the statutory scheme in which this section is found, belie Sarausad's interpretation. In enacting the statute, the Legislature intended to confront the evil of obstruction of justice:

> The legislature finds that witness intimidation and witness tampering *serve to thwart . . . the effective prosecution of criminal conduct in the state of Washington*[,] . . . [and] therefore, that tampering with and/or intimidating witnesses or other persons with information relevant to a present or future criminal or child dependency proceeding are grave offenses which *adversely impact the state's ability to promote public safety and prosecute criminal behavior*.

LAWS OF 1994, ch. 271, § 201 (emphasis added).

Similarly, it is informative that RCW 9A.72.090 is located in chapter 9A.72 RCW, entitled "Perjury and Interference with Official Proceedings." Among other offenses, this chapter criminalizes perjury,[15] false swearing,[16] intimidating a witness[17] and tampering with a witness.[18] Clearly, this chapter is intended to address crimes involving dishonesty and the obstruction of justice. It is a logical absurdity to say that RCW 9A.72.090 criminalizes the State's offer of leniency to a witness in exchange for truthful testimony.

Sarausad's trial and appellate counsel thus cannot be faulted for failing to object to witness testimony provided in exchange for leniency. Moreover, trial counsel argued vigorously that the accomplices' testimony was unworthy of belief because it was bought and paid for by the State by way of the plea bargains.

---

[15] RCW 9A.72.020, .030.

[16] RCW 9A.72.040.

[17] RCW 9A.72.110.

[18] RCW 9A.72.120.

DENIAL OF REQUEST FOR CAUTIONARY INSTRUCTION

Although he admits that failure to give a cautionary instruction with respect to testimony of an accomplice might not ordinarily warrant collateral relief, Sarausad argues that the failure to grant his requested cautionary instruction warrants relief here because the accomplice-witnesses were bribed.[19] We have already rejected the premise that the State violated the bribery statute by plea-bargaining with the accomplices. Moreover, a cautionary instruction is required only if the accomplice testimony is uncorroborated. *State v. Gross*, 31 Wn.2d 202, 196 P.2d 297 (1948). "[W]hile the corroborating evidence must be independent of the testimony of the accomplice, it is sufficient if it fairly tends to connect the accused with the commission of the crime charged; and it is not necessary that the accomplice be corroborated in every part of his testimony." *Id.* at 216-17.

Lev Arakelyan was charged with reckless endangerment in the second degree in exchange for his promise to testify truthfully; Luke Gosho, Michael Vincencio and Michael Marckx were each charged with reckless endangerment in the first degree in exchange for their promises. As these individuals' testimonies implicated Sarausad in the drive-by shooting, under *Gross* we must determine whether there is independent corroborating evidence that connects him to the crimes charged. A single example will suffice: Arakelyan testified that he thought Sarausad was driving the red car in the first trip to Ballard. The red car was identified by another witness as Sarausad's vehicle, and Sarausad himself testified that he was driving the red car during the two trips to Ballard High School. Numerous independent witnesses testified that during the second trip

---

[19] "The testimony of an accomplice, given on behalf of the plaintiff, should be subjected to careful examination in the light of other evidence in the case, and should be acted upon with great caution. You should not find the defendant guilty upon such testimony alone unless, after carefully considering the testimony, you are satisfied beyond a reasonable doubt of its truth." Clerk's Papers at 25.

to Ballard High School, the red car slowed down briefly as shots were fired from the vehicle, and then sped away. This independent testimony is adequate corroboration of Sarausad's participation in the drive-by shooting. Sarausad was not convicted on the basis of the accomplices' testimony alone. No cautionary instruction was required.

## DOUBLE JEOPARDY

Sarausad argues at great length and with apparent sincerity that his constitutional protection against double jeopardy was violated when the State charged and he was convicted of one count of second degree intentional murder (Fernandes) and two counts of attempted murder in the second degree (Lam and Nguyen). The State's theory was that Ronquillo, the shooter, fired the handgun with premeditated intent to kill Lam and Nguyen but accidentally killed Fernandes instead. The jury was instructed on the doctrine of transferred intent and the prosecutor explained during closing argument that the doctrine is based on the premise that a person should not be rewarded for being a bad shot. Sarausad now contends that the Legislature did not intend to punish a person more harshly for being a bad shot; thus, under the murder statute the State must elect whether to charge the actual murder or the attempted murder—in that charging both violates the double jeopardy rule. He argues further that applying the doctrine of transferred intent brings this case within the same rules that would apply if the State tried to convict a defendant both of attempted murder and actual murder of the same victim, by means of a single gunshot.

Sarausad first points to the premeditated murder statute which provides that "[a] person is guilty of murder in the first degree when: (a) With premeditated intent to cause the death of another person, he or she causes the death of such person *or of a third person.*" RCW 9A.32.030(1)(a) (emphasis Sarausad's). He reasons that because the first degree murder statute clearly contemplates the accidental situa-

tion where one victim is targeted but another is hit, and because the Legislature did not include in the murder statute authorization to charge twice—once for the miss and once for the hit—the State must elect whether to charge based on the attempt or the completed act. This, he contends, is because the murder statute says a person is guilty of murder when with the requisite intent he kills the person he meant to kill *"or"* a third person, and if the Legislature had meant to allow prosecutions for both the hit and the miss, it would not have used the disjunctive "or."

Sarausad reaches this conclusion via a "single shot" theory, that is, a single shot that was aimed at one person but missed and hit a third person. For authority, he points to *Ladner v. United States*, 358 U.S. 169, 79 S. Ct. 209, 3 L. Ed. 2d 199 (1958). There, a defendant who fired a single discharge from a shotgun at two federal officers was charged with, convicted of and sentenced consecutively for two counts of assault with a deadly weapon—one count for each of the federal officers. The high court reversed on collateral review, not on grounds of double jeopardy, but because Congress had not made its intended unit of prosecution clear, thus, lenity required the less harsh of the two possible meanings. *See also State v. Adel*, 136 Wn.2d 629, 634, 965 P.2d 1072 (1998) (when a defendant is convicted of violating the same statute multiple times, the same evidence test will never be satisfied and the proper inquiry is what unit of prosecution the Legislature intended as the punishable act under the specific criminal statute).

Sarausad reasons further that each of the elements of attempted first degree murder is necessarily included within the definition of completed first degree murder. It is not possible to commit first degree murder without attempting to do so. It is elementary that a defendant cannot be convicted of both attempting to murder a person and completing the murder of that same person by means of a single gunshot. From there, Sarausad, in a giant leap of logic, comes full circle by concluding that just as a defendant cannot be convicted of both attempting to murder one

person and completing the murder of that same person by firing a single shot, neither can he be convicted of both attempting to murder one person but accidentally killing another person instead, by firing a single shot.

 If for no other reason, this precariously structured analysis comes tumbling down when one considers that here, aided and abetted by Sarausad, Ronquillo fired not 1 shot but at least 6 and perhaps as many as 10 shots—Sarausad himself testified that he heard 10 shots. These shots were aimed directly at a group of young people, two of whom Ronquillo intended to kill, though only Fernandes was actually killed.

The double jeopardy clauses of the Fifth Amendment and Const. art. I, § 9 prohibit multiple punishments for the same offense. *State v. Calle*, 125 Wn.2d 769, 772, 888 P.2d 155 (1995) (citing *State v. Noltie*, 116 Wn.2d 831, 848, 809 P.2d 190 (1991)). Double jeopardy analysis in Washington is guided by the "same elements" test, which creates a presumption that a defendant is subjected to double jeopardy if he or she is convicted of offenses that are identical both in fact and in law. *Calle*, 125 Wn.2d at 777. Two offenses are legally identical if proof of one offense would also necessarily prove the other. *Id.* However, double jeopardy is not implicated where each offense charged harms a different victim, as the offenses would thus not be identical in fact. *State v. McJimpson*, 79 Wn. App. 164, 169, 901 P.2d 354 (1995) (while charge of second degree assault with a deadly weapon was subsumed into charge of second degree felony murder and was thus identical in law, offenses were not identical in fact because each offense harmed a different victim).

*Manrique v. State*, 994 S.W.2d 640 (Tex. Crim. App. 1999) is instructive. There, the defendant claimed a double jeopardy violation for his conviction on two counts of attempted murder arising out of his act of firing at least 26 rounds from an AK-47 assault rifle into a house occupied by several persons. In a concurring opinion, the Texas court noted that "[t]his case involves 'multiple punishments' in a single

proceeding for multiple violations of the same statute by different acts with different victims. Each round fired from the AK-47 assault rifle was a different and discrete act." *Id.* at 646 (McCormick, J., concurring) (citing *Blockburger v. United States*, 284 U.S. 299, 301-03, 52 S. Ct. 180, 76 L. Ed. 306 (1932)). Similarly, each of the at least six shots Ronquillo fired were different and discrete acts and double jeopardy is not implicated.

CONSECUTIVE SENTENCING

Sarausad argues that the trial court erred in concluding that it was required to impose consecutive sentences for the second degree intentional murder and attempted murder convictions under the "serious violent" exception in former RCW 9.94A.400(1)(b) (2000).

Former RCW 9.94A.400(1)(b) mandates that consecutive sentences be served "[w]henever a person is convicted of two or more serious violent offenses, as defined in RCW 9.94A.030, arising from separate and distinct criminal conduct." Sarausad argues that the second degree intentional murder and attempted murder counts were not "separate and distinct criminal conduct" for purposes of the mandatory consecutive sentences statute.

"Separate and distinct criminal conduct" is not defined by the statute. However, "under RCW 9.94A.400, crimes which fail to meet the statutory definition of 'same criminal conduct' are necessarily 'separate and distinct.' " *State v. Brown*, 100 Wn. App. 104, 114, 995 P.2d 1278 (2000), *review granted in part*, 143 Wn.2d 1007 (2001). Former RCW 9.94A.400(1)(a) defines "same criminal conduct" as " 'two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim.' . . . If one of these elements is missing, the multiple offenses do not encompass the same criminal conduct and, therefore, must be counted separately in calculating the offender score." *State v. Roose*, 90 Wn. App. 513, 516, 957 P.2d 232 (1998) (citing *State v. Lessley*, 118 Wn.2d 773, 778, 827 P.2d 996 (1992)).

In *State v. Wilson*, a case in which defendant was charged with four counts of assault, based on multiple gunshots fired into a tavern, our Supreme Court noted that for purposes of consecutive sentencing under the statute, "[f]our assaults, involving four victims, involve four separate and distinct criminal acts—one for each victim." 125 Wn.2d 212, 220, 883 P.2d 320 (1994).[20] Here, each murder and attempted murder count involved separate victims: Fernandes, Lam and Nguyen. The trial court did not err when it imposed consecutive sentences for the counts, as mandated by former RCW 9.94A.400(1)(b) (2000).

 Sarausad nevertheless argues that offenses based on transferred intent are not "separate and distinct" for purposes of consecutive sentencing. But a "statute is not subject to judicial interpretation where its language is plain, unambiguous, and well understood according to its natural and ordinary sense and meaning." *Roose*, 90 Wn. App. at 518. Here, the statute clearly indicates that offenses involving different victims are not the "same criminal conduct," and thus are "separate and distinct." Absent statutory language to indicate otherwise, we cannot read into the statutory language an exception based on transferred intent.[21] And we reject out of hand Sarausad's

---

[20] *See also State v. Salamanca*, 69 Wn. App. 817, 827-28, 851 P.2d 1242 (1993) (Where offense involved firing a gun into an automobile occupied by several persons, and where defendant was charged as an accomplice on multiple assault counts, for purposes of "separate and distinct criminal conduct" under the sentencing act, "[t]he assaults in this case arise from separate and distinct conduct because they involve separate and distinct victims.").

[21] Moreover, although the prosecutor explained transferred intent to the jury as if it applied to both the murder and the assault, we do not agree with Sarausad's claim that the second degree murder charge was based on transferred intent. RCW 9A.32.050(1)(a) states that a "person is guilty of murder in the second degree when . . . [w]ith intent to cause the death of another person but without premeditation, he causes the death of such person or of a third person." Thus, once the mens rea is established, RCW 9A.32.050(1)(a), not the common-law doctrine of transferred intent, provides that a person is guilty of second degree murder if he or she intends to kill one person but accidentally kills another. *See Wilson*, 125 Wn.2d at 219 (transferred intent is required only when a criminal statute matches specific intent with a specific victim). While it is true that one can commit second degree murder by causing the death of the person one specifically intends to kill,

contention that the first degree murder statute, stating as it does that a person is guilty of first degree murder if with premeditated intent he kills a person "or" a third person, reflects a legislative intent to treat transferred intent cases as the same criminal conduct in all circumstances, even when multiple shots are fired at a group of people only two of whom the shooter intended to kill.

Sarausad's personal restraint petition is denied and dismissed.

Cox and ELLINGTON, JJ., concur.

RCW 9A.32.050(1)(a) does not require this, as indicated by the language "or of a third person." While Sarausad would have us believe that this language requires the State to elect between prosecuting "such person or a third person" when there is more than one victim arising from a transaction, and while he claims that this is shown by the fact that the language uses the disjunctive "or" rather than the conjunctive "and," his explanation leads to the nonsensical result that one cannot be guilty of second degree murder unless one causes the death of two people. Pet'r's Opening Br. at 36-37. Rather, the Legislature's use of "or" indicates only the Legislature's intent that the crime of second degree murder can be accomplished by killing an unintended third person.