(Slip Opinion)                OCTOBER TERM, 2008                         1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WADDINGTON, SUPERINTENDENT, WASHINGTON CORRECTIONS CENTER *v.* SARAUSAD

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE NINTH CIRCUIT

No. 07–772.   Argued October 15, 2008—Decided January 21, 2009

Respondent Sarausad drove the car in a driveby shooting at a high
school, which was the culmination of a gang dispute.  En route to
school, Ronquillo, the front seat passenger, covered his lower face and
readied a handgun.  Sarausad abruptly slowed down upon reaching
the school, Ronquillo fired at a group of students, killing one and
wounding another, and Sarausad then sped away.  He, Ronquillo,
and Reyes, another passenger, were tried on murder and related
charges.  Sarausad and Reyes, who were tried as accomplices, argued
that they were not accomplices to murder because they had not
known Ronquillo's plan and had expected at most another fistfight.
In her closing argument, the prosecutor stressed Sarausad's knowl-
edge of a shooting, noting how he drove at the scene, that he knew
that fighting alone would not regain respect for his gang, and that he
was "in for a dime, in for a dollar."  The jury received two instructions
that directly quoted Washington's accomplice-liability law.  When it
failed to reach a verdict as to Reyes, the judge declared a mistrial as
to him.  The jury then convicted Ronquillo on all counts and convicted
Sarausad of second-degree murder and related crimes.  In affirming
Sarausad's conviction, the State Court of Appeals, among other
things, referred to an "in for a dime, in for a dollar" accomplice-
liability theory.  The State Supreme Court denied review, but in its
subsequent *Roberts* case, it clarified that "in for a dime, in for a dol-
lar" was not the best descriptor of accomplice liability because an ac-
complice must have knowledge of the crime that occurred.  The court
also explicitly reaffirmed its precedent that the type of jury instruc-
tions used at Sarausad's trial comport with Washington law.
Sarausad sought state postconviction relief, arguing that the prose-

cutor's improper "in for a dime, in for a dollar" argument may have led the jury to convict him as an accomplice to murder based solely on a finding that he had anticipated that an assault would occur. The state appeals court reexamined the trial record in light of *Roberts*, but found no error requiring correction. The State Supreme Court denied Sarausad's petition, holding that the trial court correctly instructed the jury and that no prejudicial error resulted from the prosecutor's potentially improper hypothetical. Sarausad then sought review under 28 U. S. C. §2254, which, *inter alia,* permits a federal court to grant habeas relief on a claim "adjudicated on the merits" in state court only if the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by" this Court, §2254(d)(1). The District Court granted the petition, and the Ninth Circuit affirmed, finding it unreasonable for the state court to affirm Sarausad's conviction because the jury instruction on accomplice liability was ambiguous and there was a reasonable likelihood that the jury misinterpreted the instruction in a way that relieved the State of its burden of proving Sarausad's knowledge of a shooting beyond a reasonable doubt.

*Held:* Because the state-court decision did not result in an "unreasonable application of . . . clearly established Federal law," §2254(d)(1), the Ninth Circuit erred in granting habeas relief to Sarausad. Pp. 10–17.

   (a) When a state court's application of governing federal law is challenged, the decision " 'must be shown to be not only erroneous, but objectively unreasonable.' " *Middleton* v. *McNeil*, 541 U. S. 433, 436 *(per curiam).* A defendant challenging the constitutionality of a jury instruction that quotes a state statute must show both that the instruction was ambiguous and that there was " 'a reasonable likelihood' " that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt. *Estelle* v. *McGuire*, 502 U. S. 62, 72. The instruction "must be considered in the context of the instructions as a whole and the trial record," *ibid.,* and the pertinent question is whether the "instruction by itself so infected the entire trial that the resulting conviction violates due process,' " *ibid.* Pp. 10–11.

   (b) Because the Washington courts' conclusion that the jury instruction was unambiguous was not objectively unreasonable, the Ninth Circuit should have ended its §2254(d)(1) inquiry there. The instruction parroted the state statute's language, requiring the jury to find Sarausad guilty as an accomplice "in the commission of the [murder]" if he acted "with knowledge that [his conduct would] promote or facilitate the commission of the [murder]," Wash. Rev. Code §§9A.08.020(2)(c), (3)(a). The instruction cannot be assigned any

meaning different from the one given to it by the Washington courts. Pp. 11–12.

   (c) Even if the instruction were ambiguous, the Ninth Circuit still erred in finding it so ambiguous as to cause a federal constitutional violation requiring reversal under AEDPA. The Washington courts reasonably applied this Court's precedent when they found no "reasonable likelihood" that the prosecutor's closing argument caused the jury to apply the instruction in a way that relieved the State of its burden to prove every element of the crime beyond a reasonable doubt. The prosecutor consistently argued that Sarausad was guilty as an accomplice because he acted with knowledge that he was facilitating a driveby shooting. She never argued that the admission by Sarausad and Reyes that they anticipated a fight was a concession of accomplice liability for murder. Sarausad's attorney also homed in on the key question, stressing a lack of evidence showing that Sarausad knew that his assistance would promote or facilitate a premeditated murder. Every state and federal appellate court that reviewed the verdict found the evidence supporting Sarausad's knowledge of a shooting legally sufficient to convict him under Washington law. Given the strength of that evidence, and the jury's failure to convict Reyes—who had also been charged as an accomplice to murder and admitted knowledge of a possible fight—it was not objectively unreasonable for the Washington courts to conclude that the jury convicted Sarausad because it believed that he, unlike Reyes, had knowledge of more than just a fistfight. The Ninth Circuit's contrary reasoning is unconvincing. Pp. 13–17.

479 F. 3d 671, reversed and remanded.

   THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, BREYER, and ALITO, JJ., joined. SOUTER, J., filed a dissenting opinion, in which STEVENS and GINSBURG, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 07–772

_____

## DOUG WADDINGTON, SUPERINTENDENT, WASHINGTON CORRECTIONS CENTER, PETITIONER *v.* CESAR SARAUSAD

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[January 21, 2009]

JUSTICE THOMAS delivered the opinion of the Court.

This case arose from a fatal driveby shooting into a group of students standing in front of a Seattle high school. Brian Ronquillo was ultimately identified as the gunman; at the time of the shooting, he was a passenger in a car driven by respondent Cesar Sarausad II. A jury convicted Sarausad as an accomplice to second-degree murder, attempted murder, and assault; he was sentenced to just over 27 years of imprisonment. The Washington courts affirmed his conviction and sentence on direct review, and his state-court motions for postconviction relief were denied.

Respondent, then, filed a federal petition for a writ of habeas corpus. The District Court granted the writ. On appeal, the Court of Appeals for the Ninth Circuit agreed with the District Court that the state-court decision was an objectively "unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U. S. C. §2254(d)(1). The Court of Appeals found it unreasonable for the state court

to reject Sarausad's argument that certain jury instructions used at his trial were ambiguous and were likely misinterpreted by the jury to relieve the State of its burden of proving every element of the crime beyond a reasonable doubt. *Sarausad* v. *Porter*, 479 F. 3d 671 (2007). We disagree. Because the Washington courts reasonably applied our precedent to the facts of this case, we reverse the judgment below.

I

A

The driveby shooting was the culmination of a gang dispute between the 23d Street Diablos, of which Cesar Sarausad was a member, and the Bad Side Posse, which was headquartered at Ballard High School in Seattle, Washington. A member of the Diablos, Jerome Reyes, had been chased from Ballard by members of the Bad Side Posse, so the Diablos decided to go "to Ballard High School to show that the Diablos were not afraid" of the rival gang. App. to Pet. for Cert. 235a. The Diablos started a fight with the Bad Side Posse, but left quickly after someone indicated that police were nearby. They went to a gang member's house, still angry because the Bad Side Posse had "called [them] weak." Tr. 2660–2661. Brian Ronquillo retrieved a handgun, and the gang decided to return to Ballard and "get [their] respect back." *Id.,* at 2699.

Sarausad drove, with Ronquillo in the front passenger seat and Reyes and two other Diablos in the back seat. En route, someone in the car mentioned "'capping'" the Bad Side Posse, and Ronquillo tied a bandana over the lower part of his face and readied the handgun. *Sarausad* v. *State*, 109 Wash. App. 824, 844, 39 P. 3d 308, 319 (2001). Shortly before reaching the high school, a second car of Diablos pulled up next to Sarausad's car and the drivers of the two cars talked briefly. Sarausad asked the other driver, "'Are you ready?'" *id.,* at 844–845, 39 P. 3d, at 319,

and then sped the rest of the way to the high school. Once in front of the school, Sarausad abruptly slowed to about five miles per hour while Ronquillo fired 6 to 10 shots at a group of students standing in front of it. *Id.,* at 831, 39 P. 3d, at 312. Sarausad "saw everyone go down," Tr. 2870, and then sped away, 109 Wash. App., at 832, 39 P. 3d, at 313. The gunfire killed one student; another student was wounded when a bullet fragment struck his leg. *Id.,* at 831–832, 39 P. 3d, at 312–313.

B

Sarausad, Ronquillo, and Reyes were tried for the first-degree murder of Melissa Fernandes, the attempted first-degree murders of Ryan Lam and Tam Nguyen, and the second-degree assault of Brent Mason. Sarausad and Reyes, who were tried as accomplices, argued at trial that they could not have been accomplices to murder because they "had no idea whatsoever that Ronquillo had armed himself for the return trip." *Id.,* at 832, 39 P. 3d, at 313. They claimed that they expected, at most, another fistfight with the Bad Side Posse and were "totally and utterly dismayed when Ronquillo started shooting." *Ibid.*

Sarausad's counsel, in particular, argued that there was no evidence that Sarausad expected anything more than that the two gangs "would exchange insults, and maybe, maybe get into a fight." Tr. 1151. Sarausad testified that he considered only the "possibility of a fight," *id.,* at 2799, but never the possibility of a shooting, 109 Wash. App., at 832, 39 P. 3d, at 313. During closing arguments, Sarausad's attorney again argued that the evidence showed only that Sarausad was "willing to fight them the way they fought them the first time. And that is by push-ing and shoving and more tough talk." App. 81. That was not sufficient, the attorney argued, to find that "Cesar [Sarausad] had knowledge that his assistance would promote or facilitate the crime of premeditated murder."

*Id.,* at 83. Sarausad's attorney also explained to the jury that knowledge of just any crime, such as knowledge that criminal assistance would be rendered after the shooting, would be insufficient to hold Sarausad responsible as an accomplice to murder because "[a]ccomplice liability requires that one assists with knowledge, that their actions will promote or facilitate the commission of *the* crime." *Id.,* at 100 (emphasis added).

In response, the prosecutor focused much of her closing argument on the evidence of Sarausad's knowledge of a shooting. He had "slowed down before the shots were fired, stayed slowed down until the shots were over and immediately sped up." *Id.,* at 39. "There was no hesitation, there was no stopping the car. There was no attempt for Mr. Sarausad to swerve his car out of the way so that innocent people wouldn't get shot." *Id.,* at 40. She also argued that Sarausad knew when he drove back to the school that his gang's "fists didn't work, the pushing didn't work, the flashing of the signs, the violent altercation didn't work" because the Bad Side Posse still "laughed at them, they called them weak, they called them nothing." *Id.,* at 44. So, "[w]hen they rode down to Ballard High School that last time, . . . [t]hey knew they were there to commit a crime, to disrespect the gang, to fight, to shoot, to get that respect back. A fist didn't work, pushing didn't work. Shouting insults at them didn't work. Shooting was going to work. In for a dime, you're in for a dollar." *Id.,* at 123–124.

At the close of trial, the jury received two instructions that directly quoted Washington's accomplice-liability statute.[1] Instruction number 45 provided:

--------

[1] Washington's accomplice-liability statute provides, in pertinent part:

"A person is guilty of a crime if it is committed by the conduct of another person for which he is legally accountable. A person is legally accountable for the conduct of another person when:

Opinion of the Court

"You are instructed that a person is guilty of a crime if it is committed by the conduct of another person for which he is legally accountable. A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of *the crime*." *Id.,* at 16 (emphasis added).

Instruction number 46 provided, in relevant part:

"A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of *the crime*, he or she either:

"(1) solicits, commands, encourages, or requests another person to commit the crime or

"(2) aids or agrees to aid another person in planning or committing the crime." *Id.,* at 17 (emphasis added).

During seven days of deliberations, the jury asked five questions, three of which related to the intent requirement for accomplice liability. One questioned the accomplice-liability standard as it related to the first-degree murder instructions; one questioned the standard as it related to the second-degree murder instructions; and one stated that the jury was "having difficulty agreeing on the legal definition and concept of 'accomplice'" and whether a person's "willing participat[ion] in a group activity" makes

———————

.          .          .          .          .

"He is an accomplice of such other person in the commission of the crime.

"A person is an accomplice of another person in the commission of a crime if . . . [w]ith knowledge that it will promote or facilitate the commission of the crime, he

"(i) solicits, commands, encourages, or requests such other person to commit it; or

"(ii) aids or agrees to aid such other person in planning or committing it." Wash. Rev. Code §§9A.08.020(1)–(3) (2008) (internal numbering omitted).

"that person an accomplice to any crime committed by anyone in the group." *Id.,* at 129. In response to each question, the judge instructed the jury to reread the accomplice-liability instructions and to consider the instructions as a whole.

The jury was unable to reach a verdict as to Reyes, and the judge declared a mistrial as to him. The jury then returned guilty verdicts on all counts for Ronquillo and convicted Sarausad of the lesser included crimes of second-degree murder, attempted second-degree murder, and second-degree assault.

### C

On appeal, Sarausad argued that because the State did not prove that he had intent to kill, he could not be convicted as an accomplice to second-degree murder under Washington law. The Washington Court of Appeals affirmed his convictions, explaining that under Washington law, an accomplice must have "general knowledge" that the crime will occur, but need not have the specific intent required for that crime's commission. App. to Pet. for Cert. 259a. The court referred to accomplice liability as "a theory of criminal liability that in Washington has been reduced to the maxim, 'in for a dime, in for a dollar.'" *Id.,* at 235a. The Washington Supreme Court denied discretionary review. *State* v. *Ronquillo*, 136 Wash. 2d 1018, 966 P. 2d 1277 (1998).

Shortly thereafter, the Washington Supreme Court clarified in an unrelated criminal case that "in for a dime, in for a dollar" is not the best descriptor of accomplice liability under Washington law because an accomplice must have knowledge of "the crime" that occurs. *State* v. *Roberts*, 142 Wash. 2d 471, 509–510, 14 P. 3d 713, 734–735 (2000). Therefore, an accomplice who knows of one crime—the dime—is not guilty of a greater crime—the dollar—if he has no knowledge of that greater crime. It

was error, then, to instruct a jury that an accomplice's knowledge of "'a crime'" was sufficient to establish accomplice liability for "'the crime.'" *Ibid.*[2] The Washington Supreme Court limited this decision to instructions containing the phrase "a crime" and explicitly reaffirmed its precedent establishing that jury instructions linking an accomplice's knowledge to "the crime," such as the instruction used at Sarausad's trial, comport with Washington law. *Id.,* at 511–512, 14 P. 3d, at 736 (discussing *State* v. *Davis*, 101 Wash. 2d 654, 656, 682 P. 2d 883, 884 (1984)). An instruction that references "the crime" "copie[s] exactly the language from the accomplice liability statute" and properly hinges criminal punishment on knowledge of "the crime" for which the defendant was charged as an accomplice. 142 Wash. 2d, at 512, 14 P. 3d, at 736.

D

Sarausad next sought postconviction relief from the Washington courts. He argued that although the accomplice-liability instruction used at his trial complied with *Roberts*, "an additional clarifying instruction should have been given" because the prosecutor may have confused the jury by improperly arguing that he had been "'in for a dime, in for a dollar.'" *Sarausad,* 109 Wash. App., at 829,

––––––––––

[2] The instruction found faulty in *Roberts* provided in full:

"You are instructed that a person is guilty of a crime if it is committed by the conduct of another person for which he is legally accountable. A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of *a crime*.

"A person is an accomplice in the commission of a crime, whether present at the time of its commission or not, if, with knowledge that it will promote or facilitate its commission, he either:

"(a) solicits, commands, encourages, or requests another person to commit the crime; or

"(b) aids or agrees to aid another person in planning or committing the crime." 142 Wash. 2d, at 488–489, 14 P. 3d, at 724 (emphasis added).

39 P. 3d, at 311. Therefore, he argued, the jury may have convicted him as an accomplice to second-degree murder based solely on his admission that he anticipated that an assault would occur at Ballard High School.

The Washington Court of Appeals reexamined the trial record in its entirety in light of *Roberts*, see 109 Wash. App., at 834, 39 P. 3d, at 313–314, but found no error requiring correction. According to the court, the prosecutor's closing argument in its entirety did not convey "that the jury could find Sarausad guilty as an accomplice to murder if he had the purpose to facilitate an offense of any kind whatsoever, even a shoving match or fist fight." *Id.,* at 840, 39 P. 3d, at 317. The prosecutor's "'in for a dime, in for a dollar'" illustration also did not convey that standard. *Id.,* at 842–843, 39 P. 3d, at 318. The court explained that in every situation but one, the prosecutor clearly did not use that phrase to argue that Sarausad could be convicted of murder if he intended only a fistfight. Instead, she used it to convey a "gang mentality" that requires a wrong to the gang to be avenged by any means necessary. *Ibid.* Thus, according to the prosecutor, when a fight did not work, Sarausad knew that a shooting was required to avenge his gang. See *ibid.*

There was one "in for a dime, in for a dollar" hypothetical in the prosecutor's closing that did not convey this gang-mentality meaning and thus, the court recognized, "may or may not be problematic under *Roberts*" depending on how it was interpreted. *Id.*, at 843, 39 P. 3d, at 318.[3]

_____

[3] The prosecutor had argued in the hypothetical that an accomplice who knows that he is helping someone assault a victim bears responsibility if the victim is killed. The hypothetical stated in full:

"Let me give you a good example of accomplice liability. A friend comes up to you and says, 'Hold this person's arms while I hit him.' You say, 'Okay, I don't know that person, anyway.' You hold the arms. The person not only gets assaulted, he gets killed. You are an accomplice and you can't come back and say, 'Well, I only intended this much

The court concluded that it did not need to decide whether the hypothetical was improper under state law because, even if it was, it did not prejudice Sarausad. Sarausad's jury was properly instructed and "the prosecutor made it crystal clear to the jury that the State wanted Sarausad found guilty . . . because he knowingly facilitated the drive-by shooting and for no other reason." *Id.,* at 843–844, 39 P. 3d, at 319.

Sarausad sought discretionary postconviction review from the Supreme Court of Washington. In denying his petition, the court held that "the trial court correctly instructed the jury" that knowledge of the particular crime committed was required. App. to Pet. for Cert. 191a. The court also found that no prejudicial error resulted from the prosecutor's potentially improper hypothetical. *Id.*, at 192a. "[W]hatever the flaws in the argument, the prosecutor properly focused on Mr. Sarausad's knowing participation in the shooting, not in some lesser altercation." *Ibid.*

E

Sarausad filed this petition for a writ of habeas corpus in Federal District Court pursuant to 28 U. S. C. §2254. The District Court granted the petition, finding "ample evidence that the jury was confused about what elements had to be established in order for [Sarausad] to be found guilty of second degree murder and second degree attempted murder." App. to Pet. for Cert. 129a. The Court of Appeals for the Ninth Circuit affirmed, finding that the state postconviction court unreasonably applied this Court's decisions in *Estelle* v. *McGuire*, 502 U. S. 62 (1991), *Sandstrom* v. *Montana*, 442 U. S. 510 (1979), and

--------

damage to happen.' Your presence, your readiness to assist caused the crime to occur and you are an accomplice. The law in the State of Washington says, if you're in for a dime, you're in for a dollar. If you're there or even if you're not there and you're helping in some fashion to bring about this crime, you are just as guilty." App. 38.

*In re Winship*, 397 U. S. 358 (1970), in affirming Sarausad's conviction in spite of ambiguous jury instructions and the "'reasonable likelihood that the jury . . . applied the challenged instruction in a way' that violates the Constitution." 479 F. 3d, at 683 (quoting *Estelle, supra,* at 72). The court denied rehearing en banc over the dissent of five judges. *Sarausad* v. *Porter,* 503 F. 3d 822 (2007). We granted certiorari, 552 U. S. ___ (2008), and now reverse.

## II

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, a federal court may grant habeas relief on a claim "adjudicated on the merits" in state court only if the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U. S. C. §2254(d)(1). Where, as here, it is the state court's application of governing federal law that is challenged, the decision "'must be shown to be not only erroneous, but objectively unreasonable.'" *Middleton* v. *McNeil*, 541 U. S. 433, 436 (2004) *(per curiam)* (quoting *Yarborough* v. *Gentry*, 540 U. S. 1, 5 (2003) *(per curiam)*); see also *Schriro* v. *Landrigan*, 550 U. S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold").

Our habeas precedent places an "especially heavy" burden on a defendant who, like Sarausad, seeks to show constitutional error from a jury instruction that quotes a state statute. *Henderson* v. *Kibbe*, 431 U. S. 145, 155 (1977). Even if there is some "ambiguity, inconsistency, or deficiency" in the instruction, such an error does not necessarily constitute a due process violation. *Middleton*, *supra,* at 437. Rather, the defendant must show both that

the instruction was ambiguous and that there was "'a reasonable likelihood'" that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt. *Estelle*, *supra,* at 72 (quoting *Boyde* v. *California*, 494 U. S. 370, 380 (1990)). In making this determination, the jury instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle*, *supra,* at 72 (quoting *Cupp* v. *Naughten*, 414 U. S. 141, 147 (1973)). Because it is not enough that there is some "slight *possibility*" that the jury misapplied the instruction, *Weeks* v. *Angelone*, 528 U. S. 225, 236 (2000), the pertinent question "is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,'" *Estelle*, *supra,* at 72 (quoting *Cupp*, *supra,* at 147).

## A

The Washington courts reasonably concluded that the trial court's instruction to the jury was not ambiguous. The instruction parroted the language of the statute, requiring that an accomplice "in the commission of *the crime*" take action "with knowledge that it will promote or facilitate the commission of *the crime*." App. 16–17 (emphasis added); Wash. Rev. Code §§9A.08.020(2)(c), (3)(a) (2008). It is impossible to assign any meaning to this instruction different from the meaning given to it by the Washington courts. By its plain terms, it instructed the jury to find Sarausad guilty as an accomplice "in the commission of the [murder]" only if he acted "with knowledge that [his conduct] will promote or facilitate the commission of the [murder]." App. 16–17.[4] Because the conclu-

––––––––

[4] The dissent would reverse the Washington state courts based on the alleged confusion in Washington courts, and specifically in the Washington Court of Appeals on direct review, about the meaning of the

sion reached by the Washington courts that the jury in-
struction was unambiguous was not objectively unreason-
able, the Court of Appeals' 28 U. S. C. §2254(d)(1) inquiry
should have ended there.[5]

———————

Washington accomplice liability statute. *Post*, at 2–5 (opinion of
SOUTER, J.). But the confusion in the Court of Appeals over the appli-
cation of the statute involved the related, but legally distinct, question
whether an accomplice is required to share the specific intent of the
principal actor under Washington law. On direct appeal, respondent
argued that he should not have been convicted as an accomplice to
murder because he did not have the specific intent to kill. The Wash-
ington Court of Appeals rejected that argument because "it was not
necessary for the State to prove Sarausad knew Ronquillo had a gun, or
knew that there was a potential for gunplay that day" under Washing-
ton law, App. to Pet. for Cert. 266a, where "accomplice liability predi-
cates criminal liability on general knowledge of a crime, rather than
specific knowledge of the elements of the principal's crime," *id.*, at 259a.
But the Washington Court of Appeals never held that knowledge of a
completely different crime, such as assault, would be sufficient under
Washington law for accomplice liability for murder. See *id.,* at 258a–
259a; see also *In re Domingo*, 155 Wash. 2d 356, 367–368, 119 P. 3d
816, 822 (2005) ("[N]either *Davis* nor any of this court's decisions
subsequent to *Davis* approves of the proposition that accomplice liabil-
ity attaches for any and all crimes committed by the principal so long
as the putative accomplice knowingly aided in any one of the crimes").
In other words, the Court of Appeals had evaluated whether respon-
dent's conviction required a specific intent versus a general intent to
kill, not whether it required knowledge of a murder versus knowledge
of an assault—the issue under review here. Thus, the confusion in the
state courts referenced by the dissent has no bearing on the question
presented in this appeal, and does not support the dissent's argument
that the jury instruction in question was ambiguous.

[5] To the extent that the Court of Appeals attempted to rewrite state
law by proposing that the instruction should have included "an explicit
statement that an accomplice must have knowledge of . . . the actual
crime the principal intends to commit," 479 F. 3d 671, 689–690 (CA9
2007), it compounded its error. The Washington Supreme Court
expressly held that the jury instruction correctly set forth state law,
App. to Pet. for Cert. 191a, and we have repeatedly held that "it is not
the province of a federal habeas court to reexamine state-court deter-
minations on state-law questions." *Estelle* v. *McGuire,* 502 U. S. 62,
67–68 (1991).

B

Even if we agreed that the instruction was ambiguous, the Court of Appeals still erred in finding that the instruction was so ambiguous as to cause a federal constitutional violation, as required for us to reverse the state court's determination under AEDPA, 28 U. S. C. §2254(d). The Washington courts reasonably applied this Court's precedent when they determined that there was no "reasonable likelihood" that the prosecutor's closing argument caused Sarausad's jury to apply the instruction in a way that relieved the State of its burden to prove every element of the crime beyond a reasonable doubt. The prosecutor consistently argued that Sarausad was guilty as an accomplice because he acted with knowledge that he was facilitating a driveby shooting. Indeed, Sarausad and Reyes had admitted under oath that they anticipated a fight, Tr. 2671, 2794, and yet the prosecutor never argued that their admission was a concession of accomplice liability for murder. She instead argued that Sarausad knew that a shooting was intended, App. 123, because he drove his car in a way that would help Ronquillo "fire those shots," *id.*, at 39. The closing argument of Sarausad's attorney also homed in on the key legal question: He challenged the jury to look for evidence that Sarausad "had knowledge that his assistance would promote or facilitate the crime of premeditated murder" and argued that no such evidence existed. *Id.,* at 83.

Put simply, there was no evidence of ultimate juror confusion as to the test for accomplice liability under Washington law. Rather, the jury simply reached a unanimous decision that the State had proved Sarausad's guilt beyond a reasonable doubt. Indeed, every state and federal appellate court that reviewed the verdict found that the evidence supporting Sarausad's knowledge of a shooting was legally sufficient to convict him under Washington law. 479 F. 3d, at 677–683; *Sarausad,* 109 Wash. App., at 844–845, 39 P. 3d, at 319.

Given the strength of the evidence supporting the conviction, along with the jury's failure to convict Reyes—who also had been charged as an accomplice to murder and also had admitted knowledge of a possible fight—it was not objectively unreasonable for the Washington courts to conclude that the jury convicted Sarausad only because it believed that he, unlike Reyes, had knowledge of more than just a fistfight. The reasoning of the Court of Appeals, which failed to review the state courts' resolution of this question through the deferential lens of AEDPA, does not convince us otherwise.

First, the Court of Appeals found that the evidence of Sarausad's knowledge of the shooting was so "thin" that the jury must have incorrectly believed that proof of such knowledge was not required. 479 F. 3d*,* at 692–693. That conclusion, however, is foreclosed by the Court of Appeals' own determination that the evidence was sufficient for a rational jury to reasonably infer that Sarausad knowingly facilitated the driveby shooting. As explained above, the Court of Appeals acknowledged that the evidence showed that Ronquillo, while seated in Sarausad's front passenger seat, tied a bandana over the lower part of his face and pulled out a gun. *Id.,* at 681. There also was evidence that Sarausad then asked the Diablos in the other car, "'Are you ready?'" before driving to the school and "slow[ing] his car in front of the school in a manner that facilitated a drive-by shooting." *Ibid.* Other gang members testified to prior knowledge of the gun and to discussing the shooting as an option during the gang meeting held between trips to Ballard High School. *Id.,* at 682. There also was testimony from Sarausad that he suspected that members of the Bad Side Posse would be armed when they returned to Ballard High School, *ibid.*, making it reasonable to conclude that Sarausad would expect his gang to be similarly prepared for the confrontation. There was nothing "thin" about the evidence of Sarausad's guilt.

Second, the Court of Appeals faulted the prosecutor for arguing "clearly and forcefully" for an "in for a dime, in for a dollar" theory of accomplice liability. *Id.,* at 693. But the Washington Court of Appeals conducted an in-depth analysis of the prosecutor's argument and reasonably found that it contained, at most, one problematic hypothetical. *Sarausad, supra,* at 842–843, 39 P. 3d, at 318–319. The state court's conclusion that the one hypothetical did not taint the proper instruction of state law was reasonable under this Court's precedent, which acknowledges that "arguments of counsel generally carry less weight with a jury than do instructions from the court." *Boyde*, 494 U. S., at 384. On habeas review, the Court of Appeals should not have dissected the closing argument and exaggerated the possible effect of one hypothetical in it. There was nothing objectively unreasonable about the Washington courts' resolution of this question.[6]

Third, and last, the Court of Appeals believed that the jury's questions "demonstrated substantial confusion about what the State was required to prove." 479 F. 3d, at 693. Sarausad focuses special attention on this factor,

------

[6] The dissent accuses us of downplaying this ambiguous hypothetical, arguing that it is so rife with improper meaning that it "infect[ed] every further statement bearing on accomplice law the prosecutor made," *post*, at 7, and ensured that the jury misinterpreted the trial court's properly-phrased instruction. We disagree. The proper inquiry is whether the state court was objectively unreasonable in concluding that the instruction (which precisely tracked the language of the accomplice-liability statute) was not warped by this one-paragraph hypothetical in an argument and rebuttal spanning 31 pages of the joint appendix. The state court's conclusion was not unreasonable. The hypothetical was presented during closing arguments, which juries generally "vie[w] as the statements of advocates" rather than "as definitive and binding statements of the law," *Boyde* v. *California*, 494 U. S. 370, 384 (1990), and which, as a whole, made clear that the State sought a guilty verdict based solely on Sarausad's "knowledge that his assistance would promote or facilitate the crime of premeditated murder," App. 83; see also *id.,* at 123–124.

arguing that it was the "failure to remedy" this confusion that sets this case apart from previous decisions and establishes that the jury likely "did not understand accomplice liability" when it returned its verdict. Brief for Respondent 29, 31. But this Court has determined that the Constitution generally requires nothing more from a trial judge than the type of answers given to the jury here. *Weeks*, 528 U. S., at 234. Where a judge "respond[s] to the jury's question by directing its attention to the precise paragraph of the constitutionally adequate instruction that answers its inquiry," and the jury asks no followup question, this Court has presumed that the jury fully understood the judge's answer and appropriately applied the jury instructions. *Ibid.*

Under this established standard, it was not objectively unreasonable for the state court to conclude that Sarausad's jury received the answers it needed to resolve its confusion.[7] Its questions were spaced throughout seven

_____

[7] The dissent argues that we "sideste[p] the thrust of this record" by finding that the trial judge's answers to the jury's questions were satisfactory. *Post*, at 9–10. But our decision cannot turn on a *de novo* review of the record or a finding that the answers were "the best way to answer jurors' questions," *id.*, at 10. On federal habeas review, this Court's inquiry is limited to whether the state court violated clearly established federal law when it held that the jury applied the correct standard, in light of the answers given to its questions. See 28 U. S. C. §2254(d)(1). On that issue, the state court was not objectively unreasonable; the jury's questions were answered in a manner previously approved by this Court, and they consistently referred the jury to the correct standard for accomplice liability in Washington. The dissent also ignores the important fact that the jury convicted Ronquillo of first-degree murder, convicted respondent of second-degree murder, and failed to reach an agreement on Reyes' guilt, causing a mistrial on the first-degree murder charge pending against him. The jury's assignment of culpability to two of the codefendants, versus its deadlock over a third who, like respondent, conceded knowledge of an assault, demonstrates that the jury understood the legal significance of each defendant's relative knowledge and intent with respect to the murder.

days of deliberations, involved different criminal charges, and implicated the interrelation of several different jury instructions. The judge pinpointed his answers to the particular instructions responsive to the questions and those instructions reflected state law. Under these circumstances, the state court did not act in an objectively unreasonable manner in finding that the jury knew the proper legal standard for conviction.

## III

Because the state-court decision did not result in an "unreasonable application of . . . clearly established Federal law," 28 U. S. C. §2254(d)(1), the Court of Appeals erred in granting a writ of habeas corpus to Sarausad. The judgment below is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 07–772

_____

## DOUG WADDINGTON, SUPERINTENDENT, WASHINGTON CORRECTIONS CENTER, PETITIONER *v.* CESAR SARAUSAD

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[January 21, 2009]

JUSTICE SOUTER, with whom JUSTICE STEVENS and JUSTICE GINSBURG join, dissenting.

The issue in this habeas case is whether it was objectively reasonable for the state court to find that there was no reasonable likelihood that the jury convicted respondent Cesar Sarausad on a mistaken understanding of Washington law. The underlying question is whether the jury may have thought it could find Sarausad guilty as an accomplice to murder on the theory that he assisted in what he expected would be a fist fight, or whether the jury knew that to convict him Washington law required it to conclude Sarausad aided in what he understood was intended to be a killing.

So far as the instructions addressed these alternatives, the judge charged the jurors in these words:

> "A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:
>
> "(1) solicits, commands, encourages, or requests another person to commit the crime or
>
> "(2) aids or agrees to aid another person in planning or committing the crime." App. 17.

The majority answers the underlying question by rely-

ing on the general rule that incorporating a clear statute into a jury charge almost always produces an adequate instruction, which the jury is assumed to follow. The kicker of course is that the general rule is only good if the incorporated statute is clear enough to require the jury to find facts amounting to a violation of the law as correctly understood.

Does the rule apply here? The majority says it does. It says the instruction quoted is unambiguous because it parrots the language of the Washington statute on accomplice liability, *ante*, at 11, and that "[i]t is impossible to assign any meaning to this instruction" and, by extension, the statute, "different from the meaning given to it by the Washington courts," *ibid.*

That is not, however, what the record shows. Rather than a single understanding, the Washington courts have produced a record of discordant positions on the meaning of the statute, and the Washington Court of Appeals can itself attest to a degree of difficulty in understanding the statutory requirement sufficient to show the statute to be ambiguous and the statute-based instruction constitutionally inadequate: that court read the statute to mean just the opposite of what the majority now claims it unambiguously requires.

On Sarausad's direct appeal in 1998, the State Court of Appeals set out the principles on which it understood accomplice liability in Washington to be premised. It did not say that the accomplice must understand that he is aiding in the commission of the same offense the principal has in mind, or the offense actually committed. Instead, the Washington Court of Appeals said this:

"(1) To convict of accomplice liability, the State need not prove that principal and accomplice shared the same mental state, (2) accomplice liability predicates criminal liability on general knowledge of a crime,

rather than specific knowledge of the elements of the principal's crime, and (3) an accomplice, having agreed to participate in a criminal activity, runs the risk that the primary actor will exceed the scope of the preplanned illegality." *Washington* v. *Ronquillo*, No. 35840–5–I etc. (Mar. 2, 1998), App. to Pet. for Cert. 233a, 258a–259a.

In support, the court cited *State* v. *Davis*, 101 Wash. 2d 654, 682 P. 2d 883 (1984), in which the Supreme Court of Washington noted that "an accomplice, having agreed to participate in a criminal act, runs the risk of having the primary actor exceed the scope of the preplanned illegality." *Id.*, at 658, 682 P. 2d, at 886. As today's majority notes, *ante*, at 6, the state appellate court remarked that the Washington law of accomplice liability (as it then understood it) "'has been reduced to the maxim, "in for a dime, in for a dollar"'"; the court also held that "it was not necessary for the State to prove Sarausad . . . knew that there was a potential for gunplay that day." *Washington* v. *Ronquillo*, *supra*, at 235a, 266a. So much for the majority's confidence that the statute-based instruction can only be understood as requiring what the State Supreme Court now says it requires: proof that the accomplice understood that he was aiding in the commission of the very crime he is charged with facilitating.

The State Supreme Court clarified this requirement two years after the Court of Appeals held against Sarausad. In *State* v. *Roberts*, 142 Wash. 2d 471, 14 P. 3d 713 (2000), the Supreme Court of Washington held that the Court of Appeals's "in for a dime, in for a dollar" view of accomplice liability was a misreading of the statute and a flat-out misstatement of law. In *Roberts*, the State Supreme Court revisited *Davis*, which it explained as standing for the principle "that an accomplice need not have specific knowledge of *every element* of the crime committed by the

principal, provided he has general knowledge of that specific crime." 142 Wash. 2d, at 512, 14 P. 3d, at 736. Although a "general knowledge" of "that specific crime" intended by a confederate and eventually committed will suffice for the mental element of accomplice liability, mere "knowledge by the accomplice that the principal intends to commit 'a crime' does not impose strict liability for any and all offenses that follow." *Id.*, at 513, 14 P. 3d, at 736. In other words, it was incorrect to read the statute as the Supreme Court of Washington had arguably done in *Davis* (and the State Court of Appeals certainly did in this case), to mean that anyone who agrees "to participate in a criminal act . . . runs the risk of [accomplice liability for a more serious crime if] the primary actor exceed[s] the scope of the preplanned illegality," 101 Wash. 2d, at 658, 682 P. 2d, at 886. The reductive maxim "in for a dime, in for a dollar" was now understood to be a distortion of Washington's accomplice liability law.

The Washington Court of Appeals said as much when Sarausad appeared before it the second time, seeking postconviction relief: "[Sarausad] points out, and correctly so, that this court decided [his direct] appeal on the premise that 'in for a dime, in for a dollar' correctly characterized Washington accomplice liability law. We said that 'an accomplice, "having agreed to participate in a criminal act, runs the risk of having the primary actor exceed the scope of the preplanned illegality."'" *Sarausad* v. *Washington*, 109 Wash. App. 824, 833–834, 39 P. 3d 308, 313 (2001). The Court of Appeals said that it had "erred" in determining that it was unnecessary for the State to prove Sarausad knew he was facilitating a drive-by shooting. *Id.*, at 837, 39 P. 3d, at 315.

This profession of judicial error in understanding the law is the touchmark not of a clear statute, but of an indistinct or perplexing one, which the law calls ambiguous. The majority is thus unquestionably mistaken in

finding it "impossible to assign any meaning to [the instruction quoting the statute that is] different from the meaning" the majority thinks is clear. *Ante*, at 11. Given that error on the majority's part, it has not justified its reversal of the Ninth Circuit by showing that the instruction was clear.\*

There remains the question whether the majority's second conclusion is also unjustifiable: despite inadequate instruction, did the jurors nevertheless apply the correct view of state law, which only recently, and after the trial, attained its current clarity? The state postconviction court found no reasonable likelihood that the jurors failed to apply a correct understanding of accomplice liability, *Sarausad* v. *Washington*, *supra*, at 843–844, 39 P. 3d, at 318–319, and Sarausad's burden here (on federal habeas)

———————

\*As the majority notes, *ante*, at 11, n. 4, in the Washington Court of Appeals on direct review, Sarausad's counsel claimed that state law required that an accomplice to murder have a specific intent to kill (or aid in killing). The Court of Appeals rejected this position. Contrary to the majority view, *ante*, at 12, n. 4, in gauging the adequacy of an instruction incorporating statutory terms, the fact that defense counsel may have asked for too much does nothing to lessen the pertinence of opaque state law or its uncertainty in the minds of the state judges. The Court of Appeals in its very response to counsel's argument demonstrated its misunderstanding of the scope of Washington accomplice liability law: "accomplice liability predicates criminal liability on general knowledge of *a* crime." *Washington* v. *Ronquillo*, No. 35840–5–I etc. (Mar. 2, 1998), App. to Pet. for Cert. 233a, 259a (emphasis added). For that matter, the Court of Appeals subsequently disavowed the very statement used by the majority to support its contention that the court was focused solely on the issue of specific intent. The court, in the postconviction proceedings, concluded that it was in fact necessary for the State to prove Sarausad knew Ronquillo had a gun, or knew there was potential for gunplay that day. *Sarausad* v. *Washington*, 109 Wash. App. 824, 837, 39 P. 3d 308, 315 (2001). This knowledge would have been necessary regardless of whether the law required Sarausad to have specific or general intent to kill, unless, of course, accomplice liability was predicated on an "in for a dime, in for a dollar" theory of liability and knowledge of a fistfight could suffice.

is to demonstrate that the state court was objectively unreasonable in drawing this conclusion, 28 U. S. C. §2254(d)(1). The District Court and the Ninth Circuit found he had done just that, whereas the majority today insists those courts were wrong.

The majority's position is simply unrealistic. Even a juror with a preternatural grasp of the statutory subtlety would have lost his grip after listening to the prosecutor's closing argument, which first addressed the state law of accomplice liability with a statement that was flatout error, followed that with a confusing argument that could have reflected either the correct or the erroneous view, and concluded with an argument that could have fit either theory but ended with a phrase defined to express the erroneous one.

In her first pass at the subject, the prosecutor said unequivocally that assaultive, not murderous, intent on Sarausad's part would suffice for the intent required of an accomplice to murder.

> "Let me give you a good example of accomplice liability. A friend comes up to you and says, 'Hold this person's arms while I hit him.' You say, 'Okay, I don't like that person, anyway.' You hold the arms. The person not only gets assaulted, he gets killed. You are an accomplice and you can't come back and say, 'Well, I only intended this much damage to happen.' Your presence, your readiness to assist caused the crime to occur and you are an accomplice. The law in the State of Washington says, if you're in for a dime, you're in for a dollar. If you're there or even if you're not there and you're helping in some fashion to bring about this crime, you are just as guilty." App. 38.

Thus, in what the majority would launder into "one problematic hypothetical," *ante*, at 15, the prosecutor introduced the "in for a dime, in for a dollar" locution, which

she defined to mean that readiness to aid in the commis-
sion of any crime thought to be intended by the principal
is enough intent for accomplice liability for whatever
crime the principal actually commits. This lead-off mis-
statement of the law, never corrected by the trial judge,
infects every further statement bearing on accomplice law
the prosecutor made, for into each effort she consistently
introduced the viral catchphrase "in for a dime, in for a
dollar."

In a second reference to accomplice law, the prosecutor
discussed gang mentality and used the phrase, without
modifying her earlier explanation of its legal meaning,
then followed up with a reference to the evidence that
could have fit either the erroneous theory or the law as
corrected by *Roberts:*

> "Mr. Sarausad [was] present and . . . certainly ready
> to assist. And I remind you, too, what you heard not
> only from . . . the gang expert in this case, but from
> [gang] member after [gang] member who told you that
> an affront to one is an affront to all, 'When you disre-
> spect me you disrespect my gang.' . . .
>
> "They were all there that day . . . ready to back each
> other up in whatever happened. In for a dime, they
> were in for a dollar and they were sticking together.
>
> " . . . You know, the best indication of what was go-
> ing on just before the shooting is gleaned by what
> happened immediately after the fact. . . . Nothing
> [was] said to the [gunman], because there was nothing
> to say. Nobody asked him why he did it. They all
> knew. They all knew what they were there for. An af-
> front to one is an affront to all." App. 40–41.

The confusion of the correct and erroneous theories of
liability showed up again in the prosecutor's final rebuttal:

> "Mr. Sarausad's lawyer says that an accomplice has
> to have the same mental state as the person doing the

shooting. . . . Not true, not true. And that's not what the instruction says.

"And I've told you the old adage, you're in for a dime, you're in for a dollar. If their logic was correct, they're not ever an accomplice to anything. The get-away driver for a bank robbery would say, 'I just told him to rob them, I didn't tell him to shoot him, I didn't do anything.' The example I gave you earlier, 'I just told my friend to hold the arms down of this person while he hit him, I didn't tell him to kill him, I'm not guilty of anything.' If you're in for a dime, you're in for a dollar.

"When they rode down to Ballard High School that last time, I say they knew what they were up to. They knew they were there to commit a crime, to disrespect the gang, to fight, to shoot, to get that respect back. A fist didn't work, pushing didn't work. Shouting insults at them didn't work. Shooting was going to work. In for a dime, you're in for a dollar." *Id.*, at 123–124.

In the prosecutor's jumble of rules, one proposition is both clear and clearly erroneous: the statement of law, "in for a dime, in for a dollar." It unmistakably contradicts the construction for which Sarausad's counsel correctly argued, which would have required the jury to find that Sarausad understood that the object was killing in order to find him guilty as an accomplice to murder. *Id.*, at 83–84.

The point here is not to excoriate the prosecutor, who tried this case in the period between *Roberts* and *Davis* and could fairly assume that her expansive ("in for a dime . . .") view of accomplice liability was good law in her State. The point is just the obvious one that cannot be evaded without playing make-believe with the record: an uncertain instruction by the trial judge was combined with

confounding prosecutorial argument incorporating what the state courts now acknowledge was a clearly-erroneous statement of law, in contrast to the view of the law argued by defense counsel. In these circumstances jury confusion is all but inevitable and jury error the reasonable likelihood.

If there were any doubt about that, one could simply look at the record of the jury's deliberations, in the course of which the jurors repeatedly asked the court to clarify the law on accomplice liability. They began deliberating on Friday, October 21, 1994, and the following Tuesday, they asked (as to the instructions laying out the crime of first-degree murder and the required premeditation), "does the 'intent' apply to (the defendant only) or to (the defendant or his accomplice)?" App. 126. The judge replied, "Refer to instructions 46 and 47 and consider your instructions as a whole." *Ibid.* Three days later, October 28, this time in reference to the second-degree murder instructions, the jury enquired a second time about accomplice liability, asking whether "intentional appl[ies] to only the defendant or only his accomplice?" *Id.*, at 128. The judge's response was nearly identical to his first one: "Refer to instructions 45 & 46 and consider the instructions as a whole." *Ibid.* The following Monday, the jury returned to deliberations and requested help yet again, spelling out its confusion: "We are having difficulty agreeing on the legal definition and concept of 'accomplice.' . . . [W]hen a person willing[ly] participates in a group activity, is that person an accomplice to any crime committed by anyone in the group?" *Id.*, at 129. Once again, the judge sent the jurors back to the written charge: "Refer to instructions . . . 45, 46, 47, and 48 and consider your instructions as a whole." *Ibid.*

The majority sidesteps the thrust of this record by suggesting that the jurors failed to let the court know of any confusion: it says the jurors' questions "involved different

criminal charges, and implicated the interrelation of several different jury instructions." *Ante*, at 17.  But this simply ignores the disclosure obviously common to all those questions: the jurors did not understand the state of mind the prosecution had to prove for accomplice liability. Their final question makes this unmistakable.

The majority says, in any case, that the judge's repeated references back to the written instructions were enough and that "it was not objectively unreasonable for the state court to conclude that [the] jury received the answers it needed to resolve its confusion." *Ante*, at 16.  But after the jurors asked three times?  In many trials, reference back to written instructions would be the best way to answer jurors' questions, which may reflect uncertain memory, not deficient instruction.  But not in this case: the accomplice liability instruction was defective owing to the ambiguity of the statutory language it incorporated, and its deficiency was underscored by the prosecutor's erroneous argument.  Telling the jurors to read an inadequate instruction three more times did nothing to improve upon it or enlighten the readers.  The District Court and the Ninth Circuit drew the only conclusion reasonably possible on this record.  I respectfully dissent.